DALE EDWARD FLANAGAN, Appellant, *v.* THE STATE OF NEVADA, Respondent.

No. 20383

RANDOLPH MOORE, Appellant, *v.* THE STATE OF NEVADA, Respondent.

No. 20483

April 30, 1991 810 P.2d 759

*Lee Elizabeth McMahon,* Las Vegas, for Appellant Dale Edward Flanagan.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Rex Bell,* District Attorney, *James Tufteland,* Deputy District Attorney, and *Thomas L. Leen,* Deputy District Attorney, Clark County, for Respondent.

*Schieck & Derke,* Las Vegas, for Appellant Randolph Moore.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Rex Bell,* District Attorney, *James Tufteland,* Deputy District Attorney, and *Daniel Seaton,* Deputy District Attorney, Clark County, for Respondent.

# OPINION

By the Court, YOUNG, J.:

In 1985, appellants Dale Flanagan and Randy Moore were convicted of murdering Flanagan's grandparents. Both Flanagan and Moore were sentenced to death and separately appealed to this court. We affirmed their convictions but reversed the sentences of death based on cumulative prosecutorial misconduct. *See* Flanagan v. State, 104 Nev. 105, 754 P.2d 836 (1988) and Moore v. State, 104 Nev. 113, 754 P.2d 841 (1988). Following a joint retrial of the penalty phase in July 1989, Flanagan and Moore were again sentenced to die. Although separately briefed and argued on appeal, we have consolidated our decisions in these cases due to the common issues presented. NRAP 3(b).

This case involves the shooting deaths of Flanagan's grandparents, Carl and Colleen Gordon. The Gordons were found dead on November 6, 1984, Carl having been shot seven times in the back and chest and Colleen having been shot three times in the head. On direct appeal, we found overwhelming evidence that Flanagan, Moore and four other co-defendants killed the Gordons so that Flanagan could obtain insurance proceeds and an inheritance under his grandparents' will. *Flanagan,* 104 Nev. at 107, 754 P.2d at 837.

At the second penalty hearing, the State called eight witnesses. In addition, Flanagan gave a brief unsworn statement to the jury in which he acknowledged that he had been involved in occult activities. Moore also gave an unsworn statement to the jury in which he admitted practicing white witchcraft.

The jury imposed sentences of death. On the special verdict form, the jury checked two mitigating circumstances: (1) the defendants' lack of significant history of prior criminal activity, and (2) "any other mitigating circumstance." In addition, the jury found four aggravating circumstances: that the murders were committed: (1) by defendants who knowingly created a great risk of death to more than one person; (2) while the defendants were engaged in the commission or attempted commission of a burglary; (3) while the defendants were engaged in the commission or attempted commission of a robbery; and (4) for the purpose of receiving money or any other thing of monetary value. Following sentencing, these appeals were filed.[1]

---

[1] At sentencing on July 31, 1989, Flanagan waived his appeal of the death penalty and requested that he be executed on the date set. The district court found that Flanagan's waiver of his right to appeal was knowing and voluntary. Thereafter, defense counsel filed a designation of the record of the proceedings and, the next day, a notice of waiver of appeal.

Upon receipt of the notice of waiver of appeal, this court entered an order

*Flanagan and Moore's Common Contentions*

Appellants Flanagan and Moore first contend that the district court erred in admitting testimony regarding their involvement in satanic worship in 1982 when they were 17 years old. Appellants argue that the evidence concerning this activity was dubious and irrelevant. They further argue that, even if the evidence is considered relevant, the district court should have excluded it because any probative value was substantially outweighed by the danger of unfair prejudice, of confusion of the issues and of misleading the jury. *See* NRS 48.035(1). Appellants also assert that the prosecutor's argument regarding satanic worship inflamed the jury and diverted it from making its sentencing decision based on relevant evidence. Appellants contend that the admission of this evidence rendered the trial fundamentally unfair and the verdict arbitrary and capricious.

One of the State's witnesses, Thomas Akers, testified that he had seen Flanagan play with tarot cards and that Flanagan had told him he was "into" devil worship. Akers also said that Flanagan told him he had the power "to push them [the Gordons] up or down, whatever he wanted." He further testified that he, Akers, had drawn a picture of a wizard and named it "Dale." A second State's witness, Wayne Wittig, testified that at age 16 he had been part of a seven-member "coven" led by Flanagan and Moore. Wittig stated that Flanagan represented black magic and Moore represented white magic, which meant that Flanagan was more the physical part of the coven, while Moore was more the mind-over-matter part. He also testified about an initiation ritual involving use of a knife to draw blood and running the blade through a candle flame "to create a centralness."

Appellants contend that the evidence of their belonging to a coven in 1982 was irrelevant because there was no evidence or suggestion that this previous activity was a causal factor or otherwise related to the crimes committed in late 1984. In addition, appellants contend that the evidence was irrelevant because there was no evidence that the coven had a sinister purpose or was committed to evil. Moore also argues that the evidence was dubious and irrelevant because there was no evidence other than that he belonged to the coven. Relying on Woodson v. North Carolina, 428 U.S. 280 (1976), appellants maintain that the

---

staying execution of Flanagan's death sentence and remanding to the district court for appointment of independent counsel to brief the question of whether Flanagan had validly waived his appeal rights. The district court appointed Lee Elizabeth McMahon who subsequently indicated that Flanagan did not wish to waive his appeal rights and be executed.

evidence was irrelevant because it was not part of their individual characters and the particular circumstances of the crime.

We conclude that this evidence was both relevant and properly admitted by the court. Under NRS 175.552, during a penalty hearing "evidence may be presented concerning aggravating and mitigating circumstances relative to the offense, defendant or victim *and on any other matter which the court deems relevant to sentence, whether or not the evidence is ordinarily admissible.*" (Emphasis added.) We have held that NRS 175.552 is not limited to the nine aggravating circumstances outlined in NRS 200.033. *See* Allen v. State, 99 Nev. 485, 488, 665 P.2d 238, 240 (1983); *see also,* Biondi v. State, 101 Nev. 252, 257, 699 P.2d 1062, 1065 (1985). Accordingly, the district court did not err in admitting the testimony about satanic worship.

Appellants also assert that the district court erred by allowing the State to use a constitutionally protected activity to seek the death penalty. Appellants rely on Zant v. Stephens, 462 U.S. 862 (1983), in which the United States Supreme Court reiterated its earlier decisions prohibiting aggravating circumstances based on constitutionally impermissible factors such as religion. *Id.* at 885. *See, e.g.,* Herndon v. Lowry, 301 U.S. 242 (1937). Here, however, the jury found four aggravating circumstances, none of which rested upon or involved constitutionally protected activities. Even assuming that the testimony regarding satanic worship involved constitutionally protected activity, *Zant* does not concern such character evidence.

Flanagan and Moore further contend that the district court's allowance of testimony regarding the sentences of the other four co-defendants violated their Eighth Amendment rights to have the jury consider their individual characters and records and the circumstances of their particular crimes. *See* Woodson v. North Carolina, 428 U.S. 280, 304 (1976). Appellants cite authority from several other jurisdictions in support of their argument that the prosecution should not have been allowed to introduce and argue this evidence. *See, e.g.,* People v. Belmontes, 755 P.2d 310 (Cal. 1988).

At trial, the district court allowed testimony by one of the prosecutors from the original trial and penalty hearing. The prosecutor testified that co-defendant Johnny Ray Luckett had received four consecutive sentences of life without the possibility of parole, and that co-defendant Roy McDowell had received four consecutive sentences of life with the possibility of parole.

We conclude that the district court did not err in allowing the

testimony about the sentences of the other co-defendants. The evidence was admissible under NRS 175.552 as "any other matter which the court deems relevant . . . ." Furthermore, the jury was instructed that it was not bound by the previous sentences. We believe that it was proper and helpful for the jury to consider the punishments imposed on the co-defendants. *See* State v. McKinney, 687 P.2d 570 (Idaho 1984).

Appellants next contend that Jury Instruction 15, which told the jury that "[a] verdict may never be influenced by sympathy, prejudice or public opinion" violated their Eighth Amendment rights because it undermined the jury's constitutionally mandated consideration of mitigating evidence.

We have upheld virtually identical instructions in several other cases. *See* Howard v. State, 102 Nev. 572, 729 P.2d 1341 (1986); Nevius v. State, 101 Nev. 238, 699 P.2d 1053 (1985); Biondi v. State, 101 Nev. 252, 699 P.2d 1062 (1985); Milligan v. State, 101 Nev. 627, 708 P.2d 289 (1985). In upholding a similar instruction in *Nevius,* we determined that the jury was fully advised "regarding the range of mitigating circumstances" it could consider. *Nevius,* 101 Nev. at 250, 699 P.2d at 1061.

As in *Nevius,* we hold that, because the penalty jury was properly instructed to consider any mitigating circumstances, the district court did not err in instructing the jury that it should not be influenced by sympathy, prejudice or public opinion. *See Nevius,* 101 Nev. at 251, 699 P.2d at 1061. Although appellants evidently urge this court to depart from our earlier decisions in *Howard, Nevius, Biondi,* and *Milligan,* we decline to do so.

*Flanagan's Remaining Contention*

Flanagan also contends that Jury Instruction 8[2] violated his Eighth Amendment rights because it precluded the jury from considering and giving effect to relevant mitigating evidence. Relying on several United States Supreme Court decisions, Flanagan argues that, although he was permitted to introduce mitigating evidence as constitutionally required, the instructions on mitigation, namely Instruction 8, had the effect of telling the jury not to consider relevant mitigating evidence. *See, e.g.,*

_____

[2]Instruction 8 told the jury that:
Murder of the First Degree may be mitigated by any of the following circumstances, even though the mitigating circumstance is not sufficient to constitute a defense or reduce the degree of the crime:
(1) That defendant has no significant history of prior criminal activity.
(2) The youth of the defendant at the time of the crime.
(3) Any other mitigating circumstance.

Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934 (1989). There-fore, Flanagan contends that Instruction 8 resulted in a death sentence which was arbitrary and capricious because it failed to properly guide the jury regarding mitigation.

Flanagan specifically contends that Instruction 8 was constitu-tionally deficient because the introductory language, "even though the mitigating circumstance is not sufficient to constitute a defense or reduce the degree of the crime," would cause a reasonable juror to consider his mitigating evidence as irrelevant because it was unrelated to the crime itself. Next, Flanagan specifically contends that Instruction 8 was constitutionally defective because use of the "catch all" language in number 3 of the instruction, "any other mitigating evidence," failed to pro-vide specific guidelines for considering mitigating evidence of his character and background.

However, our review of Instruction 8 persuades us that a reasonable juror would conclude that mitigation was not restricted to crime-related factors because it was stated that the mitigating circumstances did *not* have to constitute a defense or reduce the degree of the crime. Furthermore, the jury in fact found two of the three mitigating circumstances to exist. In addition, the instructions as a whole adequately informed the jury of its right and duty to consider mitigating evidence. Finally, it is highly unlikely that a different outcome would have resulted from more specific instructions, given that the evidence of aggravating circumstances was overwhelming and clearly outweighed the mitigating circumstances found by the jury. Thus, we conclude that Instruction 8 did not violate the Eighth Amendment by impermissibly limiting the jury's consideration of mitigation to evidence related to the crime.

## *Moore's Remaining Contentions*

Moore also contends that the district court erred in refusing his proposed jury instruction regarding mitigation. Citing Skipper v. South Carolina, 476 U.S. 1 (1986), Moore argues that the refusal resulted in the jury not being advised that it could consider whatever it wanted to be a mitigating circumstance.

We have consistently held, however, that "it is not error to refuse to give an instruction when the law encompassed therein is substantially covered by another instruction given to the jury." Ford v. State, 99 Nev. 209, 211, 660 P.2d 992, 993 (1983). The other jury instructions, in particular Instructions 6 through 9, adequately informed the jury about the relevant law. These instructions told the jury that it was its duty to determine whether any mitigating or aggravating circumstances existed, and that it

could only impose a sentence of death if the aggravating circumstances were established beyond a reasonable doubt and if no mitigating circumstances outweighed the aggravating circumstances. The jury was apprised of the circumstances by which the crime could be aggravated or mitigated, including "any other mitigating circumstance." Therefore, we conclude that Moore's proposed instruction was properly refused because the information was adequately covered by the jury instructions given.

Additionally, Moore asserts that the district court erred by rejecting his proposed instruction in place of Instruction 6.[3] Moore contends that Instruction 6 failed to clarify that the burden rested on the State to prove that aggravating circumstances outweighed mitigating circumstances. Our review of the jury instructions, including Instruction 6, reveals that the instructions as a whole adequately informed the jury of the State's burden of proof. We conclude that the district court did not err in refusing Moore's proffered instruction.

Finally, Moore contends that the district court erred by rejecting his motion for severance prior to the second penalty hearing. However, this issue was decided in the first appeal and became the "law of the case." Hall v. State, 91 Nev. 314, 315, 535 P.2d 797, 798 (1975).

We conclude the sentences were not excessive considering the crimes and the characteristics of the defendants. Having found that appellants' contentions lack merit, we hereby affirm their death sentences.

MOWBRAY, C. J., and STEFFEN, J., concur.

ROSE, J., concurring:

The sentences imposed on the other participants in these murders should not have been received in evidence, nor should have evidence of Flanagan and Moore's prior involvement with a coven or Satan worship. These errors should not have been made, but I doubt that they influenced the result in any substantial way.

---

[3]Instruction 6 stated, in relevant part:

> The jury may impose a sentence of death only if it finds an aggravating circumstance has been established beyond a reasonable doubt, and further finds that there are no mitigating circumstances sufficient to outweigh the aggravating circumstance found.

Moore's proposed instruction stated:

> The jury may impose a sentence of death only if it finds at least one aggravating circumstance has been established beyond a reasonable doubt and further finds that *the aggravating circumstance(s) outweigh the mitigating circumstance or circumstances found.*

(Emphasis added.)

Accordingly, I would affirm Flanagan's and Moore's death sentences.

When Moore and Flanagan went to trial the second time, the cases of the four other men involved in this dastardly crime had been concluded in district court. Akers, who drove the vehicle to the victim's house, had entered a guilty plea to voluntary manslaughter pursuant to a plea bargain and received a sentence of five years, with the sentence suspended. He was placed on probation. Walsh pleaded guilty to two counts of first degree murder and was sentenced to two consecutive life sentences with possibility of parole. McDowell, the person who brought the .22 pistol to the crime scene and gave it to Flanagan, pleaded guilty to two counts of first degree murder and received four consecutive sentences of life with the possibility of parole. Luckett went to trial, and the jury found him guilty of two counts of first degree murder. He was the person who entered the house with Moore and Flanagan and shot at the grandfather with the .22 pistol. He received a penalty of four consecutive life sentences without the possibility of parole.[1]

In closing argument, the prosecutor argued to the jury that when the penalties imposed on the other defendants were considered, equity and proportionality demanded that Moore and Flanagan be given the death penalty. In introducing the subject, the prosecutor stated:

> There is yet another reason to impose the death penalty. Fairness. Equity. I want you to think for a moment about the entire case, about all of the defendants and what has happened to them. Punishment should fit the crime.
>
> In this case, let's change it a little bit. The degree of punishment should be directed and influenced by the degree of involvement. The worse you are, the worse you ought to get. The better you are, the better you ought to get. Whatever those degrees are, juries like this, judges like that, need to find the most equitable solution so that everyone gets treated relatively fairly within the confines of their own case.

The prosecutor then recited the general involvement and penalty that had been assessed against each of the other four codefendants. Then he turned his attention to the penalty that should be assessed against Moore and Flanagan:

---

[1]The State planned to introduce into evidence a large poster containing a list of all those involved in this crime and the sentences each had received to date. The defense objected and the court told the State to remove the sentences from the list because such demonstrative evidence may unduly influence the jury. However, the court permitted the State to make reference in final argument to the sentences received by all those involved.

That leaves us with these two. And when you get to life without the possibility four consecutive [the sentence entered against Luckett], that is as high as you can go. You can go no higher in terms of life sentences. There is one more upgrade, the death penalty.

Now, Johnny Ray Luckett took a shot at the grandfather and missed. These two people, we have already heard how devastating their actions are. They are killers. They are murderers, and as such, in terms of this equity argument that I am making now, they deserve no less than the death penalty. It is absolutely the only fair thing.

The penalty phase of a capital murder trial is conducted to assess the appropriate penalty that should be imposed on an individual found guilty of first degree murder. Consideration is given to the facts of the offense which usually have been presented in the guilt phase, the character and record of the defendant, and any mitigating or aggravating circumstances peculiar to this defendant. It is a procedure conducted to tailor an individual penalty to the specific defendant and has little, if anything, to do with the penalty assessed against a co-defendant.

The United States Supreme Court recognized that in a capital case the penalty is to be designed for a specific defendant.

We recognize that, in noncapital cases, the established practice of individualized sentences rests not on constitutional commands, but on public policy enacted into statutes. The considerations that account for the wide acceptance of individualization of sentences in noncapital cases surely cannot be thought less important in capital cases. Given that the imposition of death by public authority is so profoundly different from all other penalties, we cannot avoid the conclusion that an individualized decision is essential in capital cases. *The need for treating each defendant in a capital case with that degree of respect due the uniqueness of the individual is far more important than in noncapital cases.* A variety of flexible techniques—probation, parole, work furloughs, to name a few—and various post-conviction remedies may be available to modify an initial sentence of confinement in noncapital cases. The nonavailability of corrective or modifying mechanisms with respect to an executed capital sentence underscores the need for individualized consideration as a constitutional requirement in imposing the death sentence.

Lockett v. Ohio, 439 U.S. 586, 604-605 (1978) (fn. omitted, emphasis added).

A majority of the courts that have considered the issue have

determined that the sentence imposed on a co-defendant is not admissible at the murder penalty hearing of a defendant. People v. Belmontes, 755 P.2d 310 (Cal. 1988); Coulter v. State, 438 So.2d 336 (Ala.Crim.App. 1982); State v. Williams, 292 S.E.2d 243 (N.C. 1982), *cert. denied,* 459 U.S. 1056 (1983); Brodgon v. Butler, 824 F.2d 338 (5th Cir. 1987).[2] The *Coulter* case well states the reasoning expressed in the cases espoused by the majority view:

> [A]n alleged accomplice's sentence is a product of the aggra-vating and mitigating circumstances applicable to the alleged accomplice. In the sentencing phase of the trial, the fact that an alleged accomplice did not receive the death penalty is no more relevant as a mitigating factor for the defendant than the fact that an alleged accomplice did receive the death penalty would be as an aggravating circumstance against him. Simply put, an alleged accomplice's sentence has no bearing on the defendant's character or record and it is not a circumstance of the offense (italics omitted).

*Coulter, supra,* at 345-346.

The sentence a co-defendant receives at a murder penalty hearing may have little relation to his culpability or involvement in the crime. The prosecutor may offer an attractive deal to one of several defendants to secure critically necessary testimony even if the defendant was completely involved in the criminal activity (as may have happened in this case with Akers). And a jury might assess the least penalty because of a defendant's age or low IQ. On the other hand, a jury might impose the greatest penalty on a defendant whose involvement in the murder was marginal simply because of that defendant's substantial prior criminal record. There are many reasons why a specific penalty is assessed against a defendant that has nothing to do with that defendant's involve-ment in the specific crime. To me, this renders the penalty assessed against other defendants of only marginal relevance and it inserts a secondary issue into the penalty hearing that detracts from the task at hand—determining the individualized penalty for this defendant.

The establishment of a rule of law is often a two-edged sword; it may help you in one case but work to your disadvantage in another. Informing the jury of the penalties assessed against the other defendants may well have helped the prosecutor in this case, but it will certainly work to the State's disadvantage in others. Every case cited in this concurring opinion deals with a defendant's attempt to introduce the penalty assessed against

---

[2]One jurisdiction has reached the contrary result. Brookings v. State, 495 So.2d 135 (Fla. 1986).

other defendants. I do not believe the rule established by the majority is the better one or the one that will best serve prosecutors in the future.

I also concur with the opinions expressed by Justice Springer in concluding that the evidence of Satan worship and participation in a coven was far more prejudicial than probative. Neither Flanagan nor Moore was actively practicing Satanism or white magic at the time of the killings and the murders were not in any way related to a cult or ritualistic event. Evidence of a prior passing interest in Satanism coupled with the prosecutor's assertion that these defendants should be given the death penalty because they were "anti-Christ" injected prejudicial facts that should not have been in this trial.

In reviewing the penalty hearing, I come to the conclusion that the erroneous receipt of evidence and information would have had no substantial effect on Flanagan's or Moore's sentences. The evidence against them was overwhelming and showed that these were heinous murders for profit committed against benevolent grandparents. Even without the evidence I find objectionable, I feel confident that they would have received the death penalty. However, we should not sanction the receipt of evidence at trial that I believe to be clearly inadmissible.

Accordingly, I would affirm the first degree murder convictions and death sentences.

SPRINGER, J., dissenting:

There are two things wrong with the penalty hearing in this case. The first is that of allowing testimony about the sentences which were given to the other defendants involved in these homicides. I agree with Justice Rose's analysis of this error as expressed in his concurring opinion; but I do not think that the error is harmless and would order a new penalty hearing on this ground. The second error in the penalty proceedings is the prosecution's persistent depiction of Moore and Flanagan as devil worshippers and "antichrist" and condemning them for their supposed "beliefs." Devil worship does not sit well with our juries; and I agree with the trial judge that there is no question that Flanagan and Moore suffered from the "prejudicial effect" inherent in the prosecution's reliance upon the supposed devil worship and demonic beliefs and practices of the defendants. I am convinced that once the prosecution successfully portrayed Flanagan and Moore as antichrist and as believers in Satanism, the "prejudicial effect" mentioned by the trial judge came into operation; and the death penalty was inescapable, whatever else might have been brought out at the penalty hearing.

In arguing for the death penalty the prosecution condemned Flanagan and Moore for, in the words of the prosecutor, "what they believed in," saying that this was "as antiChrist as it can get" and "flies in the face of most people's deepest most dearest held beliefs." Since the prosecution conceded in its appellate briefing that there was no evidence of Moore's being a Satan worshipper, there should be no question but that Moore was unfairly condemned by the prosecution for unproven diabolical beliefs and practices. Moore is a murderer, true, but he is not, according to this record, antichrist, or a believer in devil worship. Further, Moore did not kill his own grandparents, as Flanagan did. Moore is a very young man with no criminal record. The jury may very well not have returned the death penalty for Moore had it not been for Moore's being presented to the jury by the prosecution as being aligned with the devil and his evil designs.

Flanagan's case is different. He killed his own grandparents for money. For centuries and in a number of societies the murder of one's own parents or grandparents—parricide—has been condemned and punished with more severity than other homicides.[1] It is harder in Flanagan's case than in Moore's to say that the "prejudicial effect" inherent in the devil-worship/antichrist portion of the prosecution's penalty case was so objectionable as to require a new penalty hearing; but I have two reasons for concluding that a new hearing should also be ordered for Flanagan on the basis of this error. The first reason is that condemning a person to death for what he or she professes or *believes in* clearly violates the first amendment of our federal constitution. In Baldwin v. Alabama, 472 U.S. 372, 382 (1985), the United States Supreme Court stated that, a death sentence based upon "consideration of factors that are constitutionally impermissible or totally irrelevant to the sentencing process, such as for example the race, religion, or political affiliation of the defendant, would violate the Constitution." Plainly, Flanagan's death sentence was based upon the jury's consideration of his supposed

---

[1] The crime of "parricide," murdering one's own parents or grandparents, has in all societies been considered to be more despicable than other homicides. According to Blackstone, under Roman law "parricide was punishable in a much severer manner than any other kind of homicide. After being scourged, the delinquents were sewed up in a leathern sack, with a live dog, a cock, a viper, and an ape, and so cast into the sea." Blackstone, *Commentaries on the Laws of England,* Book IV, ch. 14 at 202-03, Clarendon Press, Oxford (1769). Under the Napoleonic Code of France parricide was punished by the murderer's being taken to the place of execution, without any clothes other than his shirt, barefooted, and with his head covered with a black veil. He was then exposed on the scaffold, while an officer of the court read his sentence to the spectators. His right hand was cut off, and he was then put to death.

religious and group affiliations; thus, under *Baldwin,* the penalty hearing contained prejudicial constitutional error.[2]

Even if there were no constitutional error, I still see the matter as being governed by our case of Young v. State, 103 Nev. 233, 237-38, 737 P.2d 512, 515 (1987). In the *Young* case a "police expert" was brought into the penalty hearing to show that Young was the member of a certain gang, which gang, according to the expert, would "do anything, including torture and killing." The prosecutorial syllogism was, then: The gang members torture and kill. Young is a gang member. Therefore, Young tortures and kills. We concluded in *Young* that such an argument was of a "highly dubious and inflammatory nature," and reduced the penalty assessed by what we considered to be an improperly influenced jury.

This case is similar to *Young* because the prosecutor brought in evidence that Moore and Flanagan had formerly been members, not of a gang but, rather, of some kind of teen-aged witches' "coven." Unlike the *Young* case, however, no witness was called here to tell the jury what a "coven" was, or to prove that coven members torture and kill people, or even that coven members are dedicated to carrying out the nefarious ends of the Devil. The absence of evidential support did not prevent the prosecutor from telling the jury that these particular former coven members, Flanagan and Moore, were antichrist, devil worshippers and opposed to the "dearest held beliefs" of most people. It seems to me that the evidence and argument presented by the prosecutor in this case are far more "dubious" and far more "inflammatory" than they were in *Young*. If we were to follow the precedent set by this court in *Young,* we would have to do something about the prejudice inherent in this penalty hearing.

In this country and state certain labels tend to create virtually uneraseable prejudices. To label someone as, say, a communist, a sexual abuser of children, or even a loyal supporter of Saddam Hussein conjures such a "prejudicial effect" in the minds of most of us as to render a fair judgment by a jury in a penalty hearing very difficult if not impossible. I believe that the antichrist, devil-worship label used here probably had this kind of prejudicial effect on the jury.

I do not believe that these young men got a fair penalty hearing, and I would order a new one.

---

[2]Even if I were not convinced that Flanagan's constitutional rights were violated in this case, I would still postpone filing this opinion until the question could be resolved by the United States Supreme Court. On April 1, 1991, the Court granted certiorari in a case that presents virtually the same issue as this one. *See* Dawson v. Delaware, 581 A.2d 1078 (1990), *cert. granted,* 59 U.S.L.W. 3672 (1991).