DALE EDWARD FLANAGAN, Appellant, v. THE STATE OF NEVADA, Respondent.

No. 20383

RANDOLPH MOORE, Appellant, v. THE STATE OF NEVADA, Respondent.

No. 20483

February 10, 1993                           846 P.2d 1053

---

[2]The Honorable Miriam Shearing, Justice, did not participate in the decision of this matter.

*Lee Elizabeth McMahon,* Las Vegas, for Appellant Dale Edward Flanagan.

*Schieck & Derke,* Las Vegas, for Appellant Randolph Moore.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Rex Bell,* District Attorney, *James Tufteland,* Deputy District Attorney, *Thomas L. Leen,* Deputy District Attorney and *Daniel Seaton,* Deputy District Attorney, Clark County, for Respondent.

## OPINION

By the Court, YOUNG, J.:

In 1985, a jury convicted appellants Flanagan and Moore of murdering Flanagan's grandparents. Appellants murdered Flana-

gan's grandparents so that Flanagan could collect insurance proceeds and his inheritance under their wills. Appellants were sentenced to death, and separately appealed to this court. This court affirmed the convictions but reversed the sentences of death based on cumulative prosecutorial misconduct. Flanagan v. State, 104 Nev. 105, 754 P.2d 836 (1988); Moore v. State, 104 Nev. 113, 754 P.2d 841 (1988). Following a joint retrial of the penalty phase in July, 1989, appellants were again sentenced to death.

At the second penalty hearing, the prosecution presented evidence detailing appellants' belief in the occult, and their participation in a "coven." The prosecution used the evidence to establish appellants' bad character.[1] Focusing primarily on questions of state law, this court affirmed the convictions. Flanagan v. State, 107 Nev. 243, 810 P.2d 759 (1991).

The United States Supreme Court vacated this court's decision and remanded for reconsideration in light of Dawson v. Delaware, 112 S.Ct. 1093 (1992). Flanagan v. State, 112 S.Ct. 1464 (1992); Moore v. State, 112 S.Ct. 1463 (1992). We remand the cases for retrial of the penalty hearing.

In *Dawson,* a jury convicted the defendant of first-degree murder and other crimes. *Dawson,* 112 S.Ct. at 1095. At the penalty hearing, the prosecution presented evidence that Dawson belonged to the "Aryan Brotherhood," a white supremacist prison gang. *Id.* at 1096. The United States Supreme Court held that the State violated Dawson's First and Fourteenth Amendment rights by admitting evidence of Dawson's membership in the Aryan Brotherhood. *Id.* at 1099.

The United States Supreme Court stated that evidence of constitutionally protected associations could be admissible to show that a defendant poses a future danger to society. *Id.* at 1098. However, the mere fact that a defendant belongs to a group holding racist or other antisocial beliefs is insufficient. To be admissible, the constitutionally suspect evidence must somehow be "tied" to the defendant's crime. *Id.*

Such a tie was present in Barclay v. Florida, 463 U.S. 939 (1983), a case in which a black defendant killed a white hitchhiker. The trial court properly considered evidence that the

---

[1]In his closing argument, the prosecutor stated:

> And how about devil worship. You have read books, you have seen movies, you heard the terminology coven. It exists. They happen. Sort of tried to play down the whole deal but it happens and this coven, the evidence suggests, worshipped satan. It is as antiChrist as it can get. It flies in the face of most people's deepest most dearest held beliefs and they warmly embraced it . . . . I mean, think about that in terms of the character of the persons who you are sentencing. Think about what they did and what they believed in.

defendant belonged to the Black Liberation Army, a group whose sole purpose was to indiscriminately kill white persons and to start a racial war. *Dawson*, 112 S.Ct. at 1098 (citing *Barclay*, 463 U.S. at 942-44).

The United States Supreme Court found that the tie was missing in *Dawson:* "Because the prosecution did not prove that the Aryan Brotherhood had committed any unlawful or violent acts, or had even endorsed such acts, the Aryan Brotherhood evidence was . . . not relevant to help prove any aggravating circumstance." *Dawson*, 112 S.Ct. at 1098. The court rejected Delaware's contention that Dawson's beliefs were relevant to establishing his character: "Whatever label is given to the evidence presented, . . . we conclude that Dawson's First Amendment rights were violated by the admission of the Aryan Brotherhood evidence in this case, because the evidence proved nothing more than Dawson's abstract beliefs." *Id.*

From *Dawson*, we derive the following rule: Evidence of a constitutionally protected activity is admissible only if it is used for something more than general character evidence.[2]

In the cases of Flanagan and Moore, the jury heard detailed evidence of appellants' participation in a cult. In addition to the First Amendment's protection of associational ties, this case implicates the First Amendment's Free Exercise Clause. "The First Amendment declares that Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof. The Fourteenth Amendment has rendered the legislatures of the states as incompetent as Congress to enact such laws." Cantwell v. Connecticut, 310 U.S. 296, 303 (1940). The Free Exercise Clause guarantees "absolute" freedom of individual belief. *See* Employment Div., Or. Dep't of Human Resources v. Smith, 494 U.S. 872, 877 (1990); Bowen v. Roy, 476 U.S. 693, 699 (1986) (unrelated plurality opinion overruled on other grounds, Hobbie v. Unemployment Appeals Comm'n of Fla., 480 U.S. 136, 141 (1987)); *Cantwell*, 310 U.S. at 303. Because this protection is absolute, government may neither "penalize [n]or discriminate against individuals or groups because they hold religious views abhorrent to the authorities . . . ." Sherbert v. Verner, 374 U.S. 398, 402 (1963) (citing Fowler v. Rhode

---

[2]"[O]n the present record one is left with the feeling that the Aryan Brotherhood evidence was employed simply because the jury would find these beliefs morally reprehensible. Because Delaware failed to do more, we cannot find the evidence was properly admitted as relevant character evidence." *Dawson*, 112 S.Ct. at 1098.

Island, 345 U.S. 67 (1953)). This limitation on government is at the core of our constitutional values: "Our whole constitutional heritage rebels at the thought of giving government the power to control men's minds." Stanley v. Georgia, 394 U.S. 557, 565 (1969).

The United States Supreme Court has taken a broad view in determining which beliefs are religious and therefore subject to protection. *See* United States v. Ballard, 322 U.S. 78, 79-80 (1944). A court may not consider the merits or truthfulness of religious beliefs:

> Freedom of thought, which includes freedom of religious belief, is basic in a society of free men. [citation omitted] It embraces the right to maintain theories of life and of death and of the hereafter which are rank heresy to followers of the orthodox faiths. Heresy trials are foreign to our Constitution. . . . The miracles of the New Testament, the Divinity of Christ, life after death, the power of prayer are deep in the religious convictions of many. If one could be sent to jail because a jury in a hostile environment found those teachings false, little indeed would be left of religious freedom. The Fathers of the Constitution were not unaware of the varied and extreme views of religious sects, of the violence of disagreement among them, and of the lack of any one religious creed on which all men would agree. They fashioned a charter of government which envisaged the widest possible toleration of conflicting views. Man's relation to his God was made no concern of the state. He was granted the right to worship as he pleased and to answer to no man for the verity of his religious views. The religious views espoused by respondents might seem incredible, if not preposterous, to most people. But if those doctrines are subject to trial before a jury charged with finding their truth or falsity, then the same can be done with the religious beliefs of any sect. When the triers of fact undertake that task, they enter a forbidden domain.

United States v. Ballard, 322 U.S. at 86-87; *see also* Thomas v. Review Bd., Ind. Employment Sec. Div., 450 U.S. 707, 714 (1981) ("[R]eligious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection."). The prosecution presented evidence that appellants believed that they controlled "white magic" and "black magic," that they controlled other supernatural powers, and that they worshipped the devil. Although these beliefs are offensive to many, they are clearly religious within the broad scope of the First Amendment.

Because the prosecution introduced evidence of constitutionally protected beliefs, we must apply the *Dawson* analysis to determine whether the evidence was sufficiently "tied" to the crime.

The state detailed the ritual bonding of the members, the initiation ceremony in which each member stated "Satan is my God," and the members' belief that they could cast a spell on an enemy to cause him physical pain. However, the prosecution did not present evidence that the "coven" engaged in violent acts, or that it endorsed violent acts. Thus, using the language of *Dawson*, "the evidence was . . . not relevant to help prove any aggravating circumstance." *Dawson*, 112 S.Ct. at 1098.

Respondent insists that the cult activities were relevant to provide the jury with a clearer understanding of appellants' characters. The United States Supreme Court has already rejected this argument. *Dawson*, 112 S.Ct. at 1098. To be admissible, evidence of constitutionally protected beliefs must do something more than depict the appellants as "morally reprehensible." *Id.* In the present appeals, as in *Dawson*, the prosecution failed to link cult participation or beliefs with appellants' crimes.

Respondent claims that appellants' circumstances resemble the situation in *Barclay* more than *Dawson*. In *Barclay*, the defendant's participation in the Black Liberation Army was directly related to his crime. Barclay murdered a white hitchhiker in furtherance of his belief that blacks should engage whites in a race war. *Barclay*, 463 U.S. at 942-44. In contrast, appellants' motive for murdering Flanagan's grandparents was pecuniary gain. Respondent has never suggested that appellants committed murder in furtherance of their religious beliefs. Thus, *Barclay*, is distinguishable.

Respondent argues that the evidence was admissible to rebut appellants' evidence of conversion to Christianity. In *Dawson*, the court acknowledged the "principle of broad rebuttal." *Dawson*, 112 S.Ct. at 1099. However, the prosecution presented evidence of appellants' cult activities as part of its case-in-chief. Only then did appellants present evidence of their conversion to Christianity. "[I]t is not a desirable order of proof that would permit a prosecutor . . . to anticipate what an accused's defenses might be, absent the admission of a confession, admission against interest, or the like." Findley v. State, 94 Nev. 212, 215, 577 P.2d 867, 869 (1978) (MANOUKIAN, J., concurring); *see* People v. Boyd, 700 P.2d 782, 792 (Cal. 1985). If the trial court had ruled that evidence of cult affiliation would be admissible only on rebuttal, it is highly unlikely that appellants would have raised the

issue of their religious beliefs. But for the unconstitutional admission of the evidence in the prosecution's case-in-chief, the jury would not have heard the evidence.

In *Dawson,* the majority reserved to the state court the question of whether the state court could apply a harmless-error analysis to the constitutional violation. *Dawson,* 112 S.Ct. at 1099. However, in his concurring opinion Justice Blackmun stated: "Because of the potential chilling effect that consideration of First Amendment activity at sentencing might have, there is a substantial argument that harmless-error analysis is not appropriate for the type of error before us today." *Id.* at 1100.

On remand, the Delaware Supreme Court interpreted *Dawson* as allowing for a harmless-error analysis:

> [T]his court has concluded that the majority would not have opined that "the question of whether the wrongful admission of the Aryan Brotherhood evidence at sentencing was harmless error is . . . open for consideration by the Supreme Court of Delaware on remand," if First Amendment errors were not subject to a harmless error analysis.

Dawson v. State, 608 A.2d 1201, 1203 (Del. 1992) (quoting Dawson v. Delaware, 112 S.Ct. at 1099). The Delaware Supreme Court also relied on Clemons v. Mississippi, in which the United States Supreme Court stated that harmless-error analysis is constitutionally permissible. *Dawson,* 608 A.2d at 1203-04 (quoting Clemons v. Mississippi, 494 U.S. 738, 754 (1990)).

In *Clemons,* the United States Supreme Court applied principles which it developed in Zant v. Stephens, 462 U.S. 862 (1983). *Clemons,* 494 U.S. at 744-45. In both cases, the United States Supreme Court addressed whether harmless-error analysis was appropriate where the jury considered an unconstitutionally vague aggravating factor. These cases are distinguishable from the present cases in that they did not involve the admission of constitutionally protected activities as evidence of an aggravating factor.

In *Zant,* the United States Supreme Court considered application of the following rule in the context of a penalty hearing:

> If, under the instructions to the jury, one way of committing the offense charged is to perform an act protected by the Constitution, the rule . . . requires that a general verdict of guilt be set aside even if the defendant's unprotected conduct, considered separately, would support the verdict.

*Zant,* 462 U.S. at 883. The court held that, where the jury had

relied on an invalid statutory factor,[3] the rule would not apply to invalidate the defendant's death sentence. In explaining this conclusion, the court emphasized that the jury would have heard evidence of the defendant's prior assaults regardless of the statutory factor's validity. *Id.* at 886-87. The court made a key distinction:

> [I]t is essential to keep in mind the sense in which that aggravating circumstance is "invalid." It is not invalid because it authorizes a jury to draw adverse inferences from conduct that is constitutionally protected. Georgia has not, for example . . . . attached the "aggravating" label to factors that are constitutionally impermissible . . ., such as for example the race, *religion,* or political affiliation of the defendant . . . . *If the aggravating circumstance at issue in this case had been invalid for reasons such as these, due process of law would require that the jury's decision to impose death be set aside.*"

*Id.* at 885 (emphasis added). In *Barclay,* the United States Supreme Court relied on the same distinction. *Barclay,* 463 U.S. at 956 (Rehnquist, J., plurality opinion).

In the cases of Flanagan and Moore, the prosecution submitted evidence of appellants' religious beliefs in violation of the Constitution. The prosecution used this evidence as a nonstatutory aggravating factor. The jury would not otherwise have heard it. Thus, these cases fall squarely within the dictum from *Zant;* due process of law requires that the jury's decision to impose death be set aside. This requirement leaves no room for a harmless-error analysis.

The prosecution may not raise the issue of appellants' religious beliefs for the bare purpose of demonstrating appellants' bad character. By violating this prohibition, the prosecution invited the jury to try appellants for heresy. "[O]ur Constitution, and our criminal justice system, protect other values besides the reliability" of the jury's determinations. Rose v. Clark, 478 U.S. 570, 588 (1986) (Stevens, J., concurring). In recognition of the fundamental value embodied in the Free Exercise Clause, which affords absolute protection to religious beliefs, this court must set aside appellants' sentences.

Accordingly, we vacate the death sentences and remand the cases for a new penalty hearing.[4]

ROSE, C. J., concurs.

---

[3]The jury considered as a statutory factor the defendant's "substantial history of serious assaultive criminal convictions." *Zant,* 462 U.S. at 885. This factor was unconstitutionally vague. *Id.* at 886.

[4]THE HONORABLE MIRIAM SHEARING, Justice, did not participate in the decision of this matter.

58

SPRINGER, J., concurring:

I concur in the result only. I would simply remand the case in accordance with Moore v. State, 112 S.Ct. 1463, ...... U.S. ...... (1992); Flanagan v. State, 112 S.Ct. 1464, ...... U.S. ...... (1992).

STEFFEN, J., dissenting:

I respectfully disagree with the majority's analysis of the dictates of Dawson v. Delaware, 112 S.Ct. 1093 (1992), and its application to these consolidated cases. I therefore dissent.

The *Dawson* court framed the question presented on appeal as "whether the First and Fourteenth Amendments prohibit the introduction in a capital sentencing proceeding of the fact that the defendant was a member of an organization called the Aryan Brotherhood, where the evidence has no relevance to the issues being decided in the proceeding." *Id.* at 1095. The Court appropriately answered the question in the affirmative.

It is a fundamental tenet of both our criminal and civil justice systems that irrelevant evidence is inadmissible at trial for any purpose. In *Dawson,* the Court understandably found the stipulated evidence of Dawson's membership in the Aryan Brotherhood to be so narrow and equivocal as to be irrelevant. Indeed, the Court noted that it would have been reviewing a much different case if the prosecutor had introduced credible evidence that the Delaware organization of the Aryan Brotherhood was "a white racist prison gang that is associated with drugs and violent escape attempts at prisons, and that advocates the murder of fellow inmates." *Id.* at 1097.

It is of some importance to note that when Dawson, a white male, escaped, he killed a white female rather than a non-white fellow inmate. The inference to be drawn from the Court's language thus appears to be that if the prosecutor had demonstrated that the Delaware unit of the Aryan Brotherhood was a white racist prison gang associated with drugs, violent escape, and the murdering of fellow inmates, the evidence could have been properly considered by the jury notwithstanding the fact that the victim was a white female murdered in her home. Moreover, the Court observed that the prosecutor acknowledged that substantial differences exist among the various cells of the Aryan Brotherhood where they do not see "eye to eye" or "share a union." *Id.* at 1098.

It seems clear to me that although our society as a whole decries racial hatred and bigotry, such racial attitudes are intransigent with many people who otherwise remain productive, law-abiding citizens. Racial bigotry and hatred, without more, would hardly qualify as relevant factors in considering the death-worthiness of a capital defendant.

The instant cases involve evidence that is relevant and free from the aura of ambiguity and speculation inherent in the essentially undefined meaning of membership in the Delaware cell of the Aryan Brotherhood. The issue before us is whether evidence of Satanism or satanic "worship" was relevant character evidence for the jury deliberating the death-worthiness of the capital defendants.[1]

Despite the demeaning, stifling practice of segregation of the races sanctioned by this nation and the United States Supreme Court[2] prior to Brown v. Board of Education, 347 U.S. 483 (1954), our society survived and prospered under the rule of law, coalesced to defend itself in two world wars, and produced and nurtured the United States Constitution that ultimately served as the foundation for moving toward the ideal of racial equality among our citizens. I suggest, however, that under no circumstances could this nation have survived over a similar period of time with substantial numbers of its citizens committed to Satanism.

Whether viewed as a living supernatural being or force, or merely as a fictive rallying symbol, devotion or commitment to Satan or satanic worship is an unambiguous, unequivocal commitment to evil. The dictionary definition of Satan is: "the chief evil spirit; the great adversary of humanity; the devil." Satanism is defined as: "the worship of Satan or the powers of evil; a travesty of Christian rites in which Satan is worshiped; diabolical or satanic disposition, behavior, or activity." Satanic is defined as: "of Satan; characteristic of or befitting Satan; extremely wicked; devillike; diabolical." *The Random House Dictionary* 1704 (2d Ed. 1987).

Although differences may exist among Satanists concerning the extent to which they will inflict their commitments to antisocial

[1]In *Dawson,* the jury heard evidence that Dawson referred to himself as "Abbadon," a term he defined to a woman in a bar as "one of Satan's disciples," and that the name was also tattooed across Dawson's stomach in red letters. The *Dawson* Court provided no analysis of this evidence. Although it is true that the Court held erroneous the conclusion of the Supreme Court of Delaware that both the evidence of Aryan Brotherhood membership and use of the name "Abbadon" was proper character evidence, *Dawson,* 112 S.Ct. at 1098, there was no analysis or explanation concerning the impropriety of the evidence concerning the name "Abbadon." Indeed, as noted at the outset of this dissent, the *Dawson* Court saw fit to frame the question before it on appeal to encompass concern only for the evidence regarding Dawson's membership in the Aryan Brotherhood. The extent to which the Court was concerned about the satanistic aspect of the evidence is thus unclear, although I realize that the Court's vacation and remand of our decision in Flanagan v. State, 107 Nev. 243, 810 P.2d 759 (1991), is indicative of the fact of the Court's concern about such evidence.

[2]*See,* Plessy v. Ferguson, 163 U.S. 537 (1896).

themes upon society, there seems to be little basis for doubting that Satanism is inimical to the continuation of a moralistic society governed by law. On the other hand, society in general may condemn racial imperialists such as Dawson, but not to the extent of finding them especially deserving of death when judged as capital defendants.

I do not agree with the majority's conclusion that Satanism is a religion contemplated by the First Amendment. Although Satan's "disciples" may enjoy the right to believe and express their satanical views under the First Amendment guarantee of freedom of speech (at least until posing a clear and present danger to the nation), I have great difficulty classifying Satanism as a religion under any generally accepted connotation or popular understanding of the term. The point to be made is that Satanists have tattooed themselves with character impressions of an unambiguous nature. They have embraced evil, including amorality and lawlessness, as desirable objectives.

It seems axiomatic that every deliberate human action is preceded by an actuating thought. It has also been stated with what would appear to be more than mere superficial validity, that a person is the sum total of his prior thoughts and actions. Flanagan's involvement with Satanism was entirely consistent with his uniquely depraved act of walking into his sleeping grandmother's bedroom, lifting her up, and shooting her in the head while Moore and other confederates shot his grandfather. The killings were motivated by Flanagan's desire to accelerate the time when he would inherit his grandparents' estate. After the foul deeds were accomplished, Flanagan removed money from his grandmother's purse to purchase beer and celebrate his satanic victory over two grandparents who had given him lodging.

In Barclay v. Florida, 463 U.S. 939 (1983), the Supreme Court declared:

> In returning a conviction, the jury must satisfy itself that the necessary elements of the particular crime have been proved beyond a reasonable doubt. In fixing a penalty, however, there is no similar "central issue" from which the jury's attention may be diverted. Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty, as did respondent's jury in determining the truth of the alleged special circumstances, the jury then is free to consider a myriad of factors to determine whether or not death is the appropriate punishment.

*Id.* at 950 (quoting California v. Ramos, 463 U.S. 992 at 1008 (1983)). This court, in Gallego v. State, 101 Nev. 782, 711 P.2d 856 (1985), determined that:

> Individuals who are identified as potential recipients of the death penalty because of conduct statutorily defined as an aggravating circumstance must then be scrutinized according to their individual characteristics. This process is facilitated by consideration of mitigating circumstances and other reliable factors relevant to the life of the defendant as a whole person. Only then may a sentencing authority render an informed judgment based upon the crime and the defendant who committed it.

*Id.* at 791, 711 P.2d at 862-63.

I find it difficult to conceive of evidence more character-illuminating than that of devil worship. The message it conveys is pellucid and highly relevant to the jury's evaluation of appellants as persons separate and distinct from their crimes. I therefore conclude that the evidence of appellants' Satanism was both relevant and admissible in the penalty phase of their trial as a revealing indication of the character and death-worthiness of both individuals.

There is a second reason why, in my opinion, these cases should be affirmed. The majority concludes that the questioned evidence consists of both "religious beliefs" which are constitutionally protected and "nonstatutory aggravating factors." Thus defined, the majority holds that the evidence is not subject to a harmless error analysis. I suggest that the evidence has been mischaracterized. As noted above, I do not believe that devil worship is within the constitutional purview accorded to religion any more than human sacrifice would be under the guise of a religious practice. Both are anathema to human society and unworthy of inclusion within the Free Exercise Clause as contemplated by the framers of the Constitution. The fact that expressions of belief in either or both are, with nothing more, protected rights under the Freedom of Speech Clause or even the Free Exercise Clause does not justify excluding evidence of such beliefs as a reflection of character. Indeed, the *Dawson* Court so held in declaring that "the Constitution does not erect a *per se* barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment." *Dawson,* 112 S.Ct. at 1097.

Additionally, it suggests too much to conclude that the questioned evidence is of a nonstatutory aggravating nature. Although the evidence is nonstatutory, it is certainly not to be confused with evidence of aggravating circumstances necessary to qualify a defendant for a capital sentence. During the penalty phase of a capital trial, Nevada law permits "the introduction of evidence which is otherwise inadmissible, including evidence of character and specific instances of conduct. A defendant's character and

record are relevant to the jury's determination of the appropriate sentence for a capital crime." Pelligrini v. State, 104 Nev. 625, 630, 764 P.2d 484, 488 (1988); *see* NRS 175.552.

The evidence of Satanism introduced in the penalty phase of these consolidated cases provided relevant insights into appellants' character, thus properly focusing the jury's attention on the character of the defendants and the extent to which they might ultimately provide a positive contribution to society.

Even if I agreed with the majority's conclusion that it was error to admit evidence of appellants' involvement with Satanism, I would conclude, under the compelling facts of these cases, that the error was harmless beyond a reasonable doubt.

For the reasons abbreviated above, I would affirm the judgments and sentences imposed pursuant to the jury's verdicts. I therefore respectfully dissent.