VERNELL RAY EVANS, APPELLANT, v. THE
STATE OF NEVADA, RESPONDENT.

No. 35641

July 24, 2001

28 P.3d 498

[Rehearing denied October 2, 2001]

*JoNell Thomas,* Las Vegas, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Stewart L. Bell,* District Attorney, and *James Tufteland,* Chief Deputy District Attorney, Clark County, for Respondent.

## OPINION

By the Court, BECKER, J.:

In 1994 appellant Vernell Ray Evans was convicted of burglary and four counts of first-degree murder and sentenced to death. This court affirmed his conviction and sentence. He then filed a post-conviction petition for a writ of habeas corpus, which the

district court denied without holding an evidentiary hearing. Evans appeals.

The overarching issue is whether any of Evans's claims warranted an evidentiary hearing. We conclude that a hearing is not necessary to assess the claims, and we affirm the district court's order insofar as it upholds Evans's conviction. However, we conclude that his trial and appellate counsel were ineffective in failing to challenge arguments made by the prosecutor during the penalty phase of the trial. We therefore reverse the district court's order in part, vacate Evans's death sentence, and remand for a new penalty hearing.

## FACTS

In September 1994, a jury convicted Evans of burglary and four counts of first-degree murder. After a penalty hearing, the jury found that the mitigating circumstances did not outweigh the aggravating circumstances and imposed four death sentences. The district judge also entered a consecutive ten-year prison term for the burglary conviction. This court affirmed Evans's judgment of conviction in *Evans v. State*,[1] from which the following facts are largely taken.

Around 1:00 a.m. on May 1, 1992, officers of the Las Vegas Metropolitan Police Department responded to a report of a shooting at a Wardelle Street apartment. They discovered four people shot to death: Jermaine Woods, Steven Walker, Lisa Boyer, and Samantha Scotti. Scotti and her eighteen-month-old son, Francois, were residents of the apartment.

Four-year-old Adriana Ventura (Adriana) and her mother and infant sister also resided at the apartment. Adriana witnessed the murders and testified at trial to the following. Two men entered the apartment carrying guns. Adriana referred to the men as "Scary Eyes" and "Little Ray." The intruders first shot the two men already in the apartment, Woods and Walker. They then shot Scotti, who was in the bathroom, and Boyer, who was in the bedroom. Adriana could not remember how many times the two women were shot or which one of the intruders fired the shots, and she did not see how the men left the apartment. Sometime thereafter, Adriana's mother, Alicia Ventura (Ventura), called the apartment. Adriana answered and told her mother that Scotti was dead. After that, Adriana went to the apartment next door and told the neighbor that everyone had been killed.

Adriana testified that she did not know "Scary Eyes," but she had seen "Little Ray" before at the apartment. Adriana was unable to identify Evans as "Little Ray" either in court or in a

---

[1]112 Nev. 1172, 926 P.2d 265 (1996).

lineup at the jail. However, Ventura testified that Adriana usually referred to Evans as either "Little Ray" or "Uncle Ray."

Ventura testified that earlier that day (April 30) four men had shown up at the apartment when she, Scotti, and Walker were there. Two of the men were members of a gang at odds with Walker's gang, and one of the men called Scotti a "snitch bitch" and wanted to fight her. Eventually the four men left. Boyer also arrived at the apartment while the four men were there. She was trying to get away from her boyfriend, Everett Flowers, who had recently put a gun to her head and threatened to kill her.

Between 7:00 and 7:30 p.m., Ventura received a telephone call from Evans. Evans warned her about living with Scotti, who was a "snitch bitch" and was going to "get it some day." Ventura told Scotti about the call, but Scotti was unfazed, having received threats before.

At 10:30 p.m. Ventura left with her infant daughter for a friend's apartment to do laundry. Around midnight, Ventura spoke to Scotti on the phone. Scotti sounded normal and asked Ventura to bring some rock cocaine back to the apartment. Ventura obtained the cocaine and called back about thirty minutes later. Her daughter Adriana answered the telephone and said that Uncle Ray had come in and shot everybody. Ventura told Adriana to take Francois and go to the apartment next door.

Jeffery Grice, who lived in the apartment next door to the crime scene, testified that he heard apparent gunshots that night. Fifteen minutes later, Adriana pounded on Grice's door. When he let her in, she said, "They're all dead. . . . Uncle Ray-Ray came in, and they shot them all dead."

Shirannah Rice testified that Evans had admitted his involvement in the murders to her in a conversation on November 8, 1992. Evans told Rice that Scotti had been working for the police and had set up "Double R" (a nickname of Richard Powell's) in a drug deal and Double R went to jail. Double R therefore wanted to kill Scotti upon his release. They chose the night following the Rodney King verdicts because the police were occupied with riots in West Las Vegas. Evans said that he went to Scotti's apartment and was let in. After leaving the door unlocked, Evans signaled from the window, and his partner came in armed. Evans first shot Walker and then Woods. Evans then went to the bedroom where he and his partner shot Boyer. Next, they went into the bathroom and shot Scotti numerous times. Evans said they wanted to make her suffer. In another conversation a few months later, Evans told Rice that he was concerned Adriana could be a witness as she got older and that "they had better get her out of town if they know what's best for her."

Tina Jackson testified that Evans made admissions to her in November 1992. Evans told her that he knew Ventura had been

talking to her about the crimes and that he "did do it." He showed her a gun and bullets and said they were for her if she said anything. A few days later, Evans approached Jackson, pushed her against a wall, and warned her again to keep her mouth shut. Afraid of Evans, Jackson soon left the Las Vegas area.

Laboratory tests revealed that projectiles recovered from the heads of Woods and Walker were consistent with bullets fired from a .38 special or a .357 magnum. Two projectiles from Scotti's body came from the same .38 special or .357 magnum used to kill the two men, and another was consistent with a 9-millimeter weapon. All three projectiles fired into Boyer were consistent with the 9-millimeter used to shoot Scotti.

A palm print lifted from a closet door in the apartment matched Evans's left palm. Other prints were matched to Flowers. Both Evans and Flowers had lived in the apartment but had moved out weeks before.

Joseph Salley, the father of Ventura's younger daughter, testified as a rebuttal witness regarding admissions made to him by Evans. In July 1992, with Evans present, Powell and Flowers told Salley about the murders. Powell described how Evans had shot Walker, Salley's "homey." At some point during this discussion, Evans jumped up and exclaimed that he was a "born killer." Two weeks later, Salley met Powell and Evans to purchase crack cocaine from them. Evans told Salley that he better pay Powell after selling the cocaine or: "I'll have to do you like I did your homeys." Evans also said that Walker and Woods had been in the wrong place at the wrong time because the intended victims were "two bitches."

At the conclusion of the guilt phase of trial on September 10, 1994, the jury found Evans guilty of burglary and four counts of first-degree murder. The penalty phase commenced on September 26, 1994.

The State presented evidence that Evans had a 1992 felony conviction for leaving the scene of an accident, had a 1989 felony conviction for battery with the use of a deadly weapon, and was facing drug trafficking and parole violation charges. Members of the victims' families testified about their losses.

In mitigation, Evans offered his youthful age and the testimony of psychiatrist Dr. Norton Roitman and of family members. Dr. Roitman testified that although Evans was not mentally ill, he suffered from anxiety illness. His family testified that he was not a bad person and asked for mercy on his behalf. Evans also exercised his right of allocution. Although he did not specifically take responsibility for the murders, he said that he had made mistakes in his life and would change them if he could. He expressed con-

cern for his family and daughter and asked the jury to consider giving him a life sentence.

The jury returned death penalty verdicts on all four counts of first-degree murder. The jurors found beyond a reasonable doubt three aggravating circumstances on each murder count. They found all four murders were committed by a person previously convicted of a felony involving the use or threat of violence and by a person who knowingly created a great risk of death to more than one person. For the murder of Scotti, they also found the murder involved torture, depravity of mind, or the mutilation of the victim. They found that the other three murders were committed to avoid or prevent a lawful arrest. The jurors also found that the aggravating circumstances were not outweighed by mitigating circumstances.

Evans filed a motion for a new trial, which was denied. He separately appealed the judgment of conviction and the denial of his motion for a new trial. This court affirmed his conviction and dismissed the appeal of the denial of his motion.[2]

In May 1998, Evans petitioned the district court in proper person for a post-conviction writ of habeas corpus. In August 1999, appointed counsel filed a supplemental petition. The district court denied the petition without holding an evidentiary hearing.

## DISCUSSION

*The right to an evidentiary hearing and the application of procedural bars*

Evans contends that the district court erred in denying his petition without holding an evidentiary hearing and allowing him to conduct discovery.

A defendant seeking post-conviction relief cannot rely on conclusory claims for relief but must support any claims with specific factual allegations that if true would entitle him or her to relief.[3] The defendant is not entitled to an evidentiary hearing if the allegations are belied or repelled by the record.[4]

Further, a court must dismiss a habeas petition if it presents claims that either were or could have been presented in an earlier proceeding,·unless the court finds both cause for failing to pre-

---

[2]*Id.*; *Evans v. State*, Docket No. 29936 (Order Dismissing Appeal, November 20, 1997).

[3]*Pangallo v. State*, 112 Nev. 1533, 1536, 930 P.2d 100, 102 (1996), *limited on other grounds by Hart v. State*, 116 Nev. 558, 562-63, 1 P.3d 969, 972 (2000).

[4]*Id.*

sent the claims earlier or for raising them again and actual prejudice to the petitioner.[5] Claims of ineffective assistance of counsel are properly presented in a timely, first post-conviction petition for a writ of habeas corpus. Because such a claim is generally not appropriate for review on direct appeal, the failure to raise it "on direct appeal does not constitute a waiver of the claim for purposes of post-conviction proceedings."[6]

## Claims of ineffective assistance of counsel

Evans contends that his trial and appellate counsel were ineffective in numerous ways.

### The standard of review

A claim of ineffective assistance of counsel presents a mixed question of law and fact, subject to independent review.[7] To establish ineffective assistance of counsel, a claimant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense.[8] Deficient performance is representation that falls below an objective standard of reasonableness.[9] To show prejudice, the claimant must show a reasonable probability that but for counsel's errors the result of the trial would have been different.[10]

Judicial review of a lawyer's representation is highly deferential, and a defendant must overcome the presumption that a challenged action might be considered sound strategy.[11] The reviewing court must try to avoid the distorting effects of hindsight and evaluate the conduct under the circumstances and from counsel's perspective at the time.[12]

### Failing to prevent the admission of hearsay evidence

At trial Gregory Robertson testified for the State that Richard Powell offered him $10,000 in October 1991 to kill Scotti because

---

[5]NRS 34.810.

[6]Daniels v. State, 100 Nev. 579, 580, 688 P.2d 315, 316 (1984), modified on other grounds by Varwig v. State, 104 Nev. 40, 752 P.2d 760 (1988).

[7]Kirksey v. State, 112 Nev. 980, 987, 923 P.2d 1102, 1107 (1996).

[8]Id. (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)).

[9]Id.

[10]Id. at 988, 923 P.2d at 1107.

[11]Strickland, 466 U.S. at 689.

[12]Kirksey, 112 Nev. at 987-88, 923 P.2d at 1107.

Scotti had set Powell up to be arrested for a drug offense. The State offered this as evidence of the motive for the murder. The district court admitted the evidence against Evans under NRS 51.035(3)(e) as a statement by his co-conspirator during the course and in furtherance of the conspiracy.

Evans contends that his trial and appellate counsel were ineffective in failing to argue that there was no evidence that a conspiracy existed when Powell made the statement. In denying Evans's post-conviction petition, the district court acknowledged that it was error to admit evidence of Powell's statement but the error was harmless. The State does not dispute that it failed to show that a conspiracy existed when the statement was made, but it maintains that it was not critical evidence. Evans argues that the hearsay statement was highly prejudicial because it was the only evidence to explain why he would want to kill Scotti.

Powell's statement was not the sole evidence of motive. Shirannah Rice also testified that Evans admitted that he helped kill Scotti because Scotti had informed on Powell. We conclude that even if counsel had succeeded in excluding the hearsay statement there was no reasonable probability of a different result.

> *Failing to challenge the competency of a young witness to testify*

Evans contends that his counsel were ineffective in failing to challenge the competency of Adriana Ventura to testify. The district court concluded that the voir dire of Adriana and her subsequent testimony demonstrated she was competent.

Adriana Ventura was four at the time of the murders and six when she testified. At trial, the prosecutor first questioned Adriana about her family, the difference between the truth and lies, and the need to tell the truth. Adriana then testified regarding the murders.

According to Evans, before her trial testimony Adriana testified at a preliminary hearing, a grand jury hearing, and a federal sentencing hearing and was questioned repeatedly about the crimes by her mother, neighbors, a detective, a child psychologist, and the media. Her grandfather allowed reporters to tape her telling her story on several occasions. Evans argues that there was great potential that the child's testimony was contaminated, particularly by her mother.

Evans also asserts that Adriana's testimony shows that she was not competent to testify. For example, she was unable to remember whether she lived in a house or an apartment at the time of the murders or the name of the other child who was present.

Evans also claims that Adriana could not remember whether the murderers left through the door or jumped out of a window, but this claim is mistaken. Adriana actually said they could have done either, but she did not know because she did not watch them leave. Our review of Adriana's trial testimony shows that she readily admitted whenever she did not know or could not remember something and did not appear to make up information just to answer a question. For example, she had apparently told defense counsel before trial that each killer had shot a specific victim. She acknowledged this on cross-examination but maintained, as she had on direct examination, that she actually did not know who shot whom. The material facts which Adriana did remember and provide, such as where each victim was when shot, were consistent with the evidence at the crime scene.

A child is competent to testify if he or she is able to receive just impressions and relate them truthfully.[13] Courts must evaluate a child's competency on a case-by-case basis, but relevant considerations include:

> (1) the child's ability to receive and communicate information; (2) the spontaneity of the child's statements; (3) indications of "coaching" and "rehearsing;" (4) the child's ability to remember; (5) the child's ability to distinguish between truth and falsehood; and (6) the likelihood that the child will give inherently improbable or incoherent testimony.[14]

This court will not disturb a finding of competency absent a clear abuse of discretion.[15] A child's testimony supports a finding of competency if it is clear, relevant, and coherent.[16] Inconsistencies in the testimony go to the weight of the evidence.[17]

We conclude that Adriana's testimony indicates that she was competent. Her basic account of the crimes remained coherent and consistent, even under cross-examination. Her testimony reflected none of the serious problems—inability to differentiate between fact and fantasy, confusion between truth and falsehood, inherently improbable testimony, suggestions of coaching, inability to recall recent events—which in other cases have prompted this court to overturn the district court's finding of competency.[18]

[13]*Felix v. State*, 109 Nev. 151, 173, 849 P.2d 220, 235 (1993).

[14]*Id.*

[15]*Lanoue v. State*, 99 Nev. 305, 307, 661 P.2d 874, 874 (1983).

[16]*Id.*

[17]*Wilson v. State*, 96 Nev. 422, 423-24, 610 P.2d 184, 185 (1980).

[18]*See Felix*, 109 Nev. at 174-75, 849 P.2d at 236-37; *Lanoue*, 99 Nev. at 307, 661 P.2d at 875.

Evans also contends that the district court violated this court's directive requiring trial courts to examine a child under ten years of age before permitting her to testify. He cites this court's decision in *Felix v. State*,[19] which stands for this rule. However, at least part of the foundation for the rule no longer exists. *Felix* followed a line of authority that relied on former NRS 48.030(2), which provided that children under ten years of age could not be witnesses if they appeared ''incapable of receiving just impressions of the facts . . . or of relating them truly.''[20] Nevada's statutes no longer treat the competency of witnesses younger than ten as a special case. Even assuming the rule still retains its full force, the district court's failure to examine Adriana before she testified was prejudicial only if she indeed lacked competency. We conclude that her testimony shows she was competent.

Nevertheless, Evans's allegations regarding possible contamination of Adriana's testimony arguably warranted an evidentiary hearing. Roughly two years had passed since the crimes occurred, and she had apparently talked with a number of people about the murders. On the other hand, the mere fact that Adriana spoke with people about her experience does not establish that her testimony was improperly influenced. Evans has not pointed to any particular behavior by Adriana or to inconsistencies in her statements—or to any words or conduct by anyone else—that indicate her testimony was deliberately or inadvertently tainted. Evans stresses that a detective suspected that Adriana's mother, Ventura, knew that Scotti was going to be murdered, but he does not explain why this suggests that Ventura manipulated her daughter's account of the crimes. We conclude that the district court could have reasonably found that Evans's allegations on this issue were insufficient to warrant an evidentiary hearing.

Adriana was competent to testify; therefore, counsel's failure to challenge her competency was not deficient or prejudicial.

### *Failing to uncover exculpatory information allegedly withheld by the State*

Evans asserts that the State had a variety of exculpatory information which it did not disclose to him in violation of *Brady v. Maryland*.[21] Alternatively, he argues his counsel were ineffective in not uncovering this information independently.

---

[19]109 Nev. at 175, 849 P.2d at 236.

[20]*See Shuff v. State*, 86 Nev. 736, 738, 476 P.2d 22, 23 (1970); *Martin v. State*, 80 Nev. 307, 310, 393 P.2d 141, 143 (1964).

[21]373 U.S. 83 (1963).

*Brady* and its progeny require a prosecutor to disclose material evidence favorable to the defense; evidence is material if there is a reasonable probability that the result would have been different if it had been disclosed.[22] Such a reasonable probability is shown when the nondisclosure undermines confidence in the outcome of the trial.[23]

Evans first complains that the State withheld information that Joseph Salley testified for the State in return for witness protection benefits. This court considered this claim in dismissing Evans's appeal in 1997. The doctrine of the law of the case precludes reconsidering it.[24]

Next, Evans complains that the State provided no information on "an investigation of Ventura and her possible involvement in these murders" or "the continued investigation of Flowers." These claims fall short of alleging specifically that the State had exculpatory information. Evans speculates that material exculpatory information exists, but he does not describe it. The evidence at trial showed that Evans and at least one other person committed the crimes. The State did not conceal that it also suspected Everett Flowers and Richard Powell of the murders, and Evans presented evidence and argument at trial that Flowers had a violent relationship with and, not long before the murders, had threatened to kill one of the victims—his girlfriend, Lisa Boyer. Thus, to undermine confidence in the trial's outcome, Evans would have to allege the nondisclosure of specific information that not only linked Flowers, or Ventura, to the crimes but also indicated that Evans was not involved. He has not done so.

Evans also speculates that the State had information that Scotti was an informant in other cases but did not disclose it to the defense. He argues such information would have shown that other people had a motive to kill her. During post-conviction proceedings, the district court ordered discovery on this issue. In denying the habeas petition, the court concluded that the State did not have a list of such cases and did not have a duty to create exculpatory information for the defense where none existed. We accept the court's finding that the State did not have the information sought by Evans.

---

[22]*See Jimenez v. State*, 112 Nev. 610, 618-19, 918 P.2d 687, 692 (1996).

[23]*Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

[24]*See Pertgen v. State*, 110 Nev. 554, 557-58, 875 P.2d 361, 363 (1994).

In this claim, Evans has described a line of inquiry possibly helpful to the defense. To prepare his defense, he had a right to pursue this inquiry by means of discovery and obtain any information the State might have had on Scotti's other informant activities. But information that Scotti had acted as an informant in other cases, without at least some evidence that this activity had generated actual threats against her, would not implicate the State's affirmative duty to disclose potentially exculpatory information to the defense because such information must be material.[25] Scotti's mere acting as an informant in other cases does not reach this level. Evans seems to assume that the State has a duty to compile information or pursue an investigative lead simply because it could conceivably develop evidence helpful to the defense, but he offers no authority for this proposition, and we reject it.[26]

Next, Evans claims that the State failed to inform him of statements made by several witnesses before trial which varied from their trial testimony. This claim is belied by the record for the most part, and Evans's general allegations fail to identify any significant inconsistencies.

Evans's claims of *Brady* violations did not warrant an evidentiary hearing, and his alternative claims of ineffective assistance of counsel similarly fail to sufficiently allege either deficient performance or prejudice.

### *Failing to challenge the State's elicitation of evidence that witnesses were fearful*

Evans contends his counsel were ineffective in failing to challenge evidence elicited by the State that five witnesses were fearful.

Tina Jackson testified that she was reluctant to cooperate with prosecutors because Evans had threatened her twice and she feared him. Shirannah Rice testified that she did not contact police when Evans first told her about the murders because she was afraid he could harm her or her family members. Rice's mother testified that she feared someone might harm her daughter for cooperating with police; however, she feared gang activity, not Evans. Joseph Salley testified that he was nervous and afraid

---

[25]*See, e.g., Mazzan v. Warden*, 116 Nev. 48, 73 n.6, 993 P.2d 25, 40 n.6 (2000).

[26]*See United States v. Harvey*, 756 F.2d 636, 643 (8th Cir. 1985) (upholding denial of appellants' request that witnesses view a particular lineup because government has no obligation to create potentially exculpatory evidence where none exists).

to be a witness. And Gregory Robertson, an inmate, testified that he was concerned about his safety because he was considered a snitch.

Evans cites *Lay v. State*, where this court adopted from federal courts the holding that "the prosecution's references to, or implications of, witness intimidation by a defendant are reversible error unless the prosecutor also produces substantial credible evidence that the defendant was the source of the intimidation."[27] In *Lay*, the references to witness intimidation were not direct references to intimidation or threats by Lay.[28] Most referred to fears that Lay's fellow gang members might retaliate against witnesses.[29] Although most of the references were irrelevant to the case, the court concluded they were not misconduct requiring reversal.[30] Questions about reluctance and fright were relevant to one witness whom the defense impeached with his prior statement to police that he could not identify the shooter.[31]

Evans also relies on NRS 48.045(2), which prohibits evidence of collateral acts as proof of a person's character but allows such evidence to prove motive, opportunity, or other relevant issues. Before admitting collateral-act evidence, the district court must determine outside the presence of the jury that: the act is relevant to the crime charged; it is proven by clear and convincing evidence; and the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.[32]

We conclude that no error occurred in admitting Jackson's testimony. First, her testimony provided substantial credible evidence under *Lay* that Evans threatened her. Second, we consider NRS 48.045(2) to be inapposite. Evidence that after a crime a defendant threatened a witness with violence is directly relevant to the question of guilt.[33] Therefore, evidence of such a threat is neither irrelevant character evidence nor evidence of collateral acts requiring a hearing before its admission.[34]

The testimony of the other four witnesses regarding their fears was improper because it was irrelevant. The State asserts that the testimony was relevant because it explained why they did not contact police sooner and why there were minor inconsistencies in their statements. This assertion is unpersuasive: the State offers no authority, no reference to the record, and no analysis to sup-

[27]110 Nev. 1189, 1193, 886 P.2d 448, 450-51 (1994).

[28]*Id.* at 1193-94, 886 P.2d at 451.

[29]*Id.* at 1194, 886 P.2d at 451.

[30]*Id.*

[31]*Id.*

[32]*Tinch v. State*, 113 Nev. 1170, 1176, 946 P.2d 1061, 1064-65 (1997).

[33]*Abram v. State*, 95 Nev. 352, 356-57, 594 P.2d 1143, 1145 (1979).

[34]*Cf. Salgado v. State*, 114 Nev. 1039, 1042, 968 P.2d 324, 326 (1998).

port it. It appears that the State initiated every inquiry into delay and reluctance on the part of the witnesses; therefore, such inquiry was not relevant to rebut any impeachment by the defense in this area.

Not all the testimony was equally critical, however. Rice's mother expressly disclaimed any fear of Evans, and Robertson only referred to the general risk of retaliation from other inmates. We perceive no prejudice to Evans by their expressions of fear.

The source of Salley's fear remained unspecified, dampening but not wholly avoiding potential prejudice to Evans: jurors could have assumed Salley felt threatened by Evans and/or Richard Powell and Everett Flowers, whose conversation he testified to. And as noted, Rice explicitly stated her fear of Evans. Therefore, the evidence that Salley and Rice were afraid was potentially prejudicial to Evans, but we conclude that under *Lay* it was not reversible misconduct. In particular, we note that trial counsel seriously impeached Rice's allegation of fear by revealing on cross-examination that she continued to live with Evans for some time after the murders and then kept in touch with him and professed her love for him up until shortly before the trial. Trial and appellate counsel should have challenged admission of the evidence of the witnesses' fear, but Evans has not shown a reasonable probability of a different result had they done so.

### Failing to challenge the State's bolstering of its witnesses

Evans claims that the State improperly elicited evidence of prior consistent statements and other evidence to bolster the credibility of its witnesses and improperly vouched for its witnesses in closing argument. We conclude that some of the State's actions were improper but that counsel's failure to respond did not prejudice Evans.

The State improperly elicited evidence that Shirannah Rice made telephone calls to detectives implicating Evans in the murders. A witness's prior consistent statements are inadmissible hearsay, unless offered to rebut an express or implied charge against the witness of recent fabrication or improper influence or motive.[35] But the evidence here was not so prejudicial that there was a reasonable probability of a different result without it.[36]

---

[35]*See* NRS 51.035(2)(b).

[36]*Cf. Patterson v. State*, 111 Nev. 1525, 1533-34, 907 P.2d 984, 989-90 (1995) (concluding that admission of prior consistent statements was harmless error where the independent evidence of guilt rose above the minimal).

Evans also contests Alicia Ventura's testimony about her daughter Adriana's statements, but this evidence was admissible under NRS 51.095 because Adriana's statements were excited utterances made soon after she witnessed the murders.

The prosecutor elicited other evidence to bolster the credibility of several witnesses, but nearly all of this evidence was elicited after the defense had attacked the witnesses' veracity or competency. The State may counter impeachment of its witnesses by presenting evidence supporting their credibility.[37] Evans cites a small amount of evidence that may have bolstered Rice's credibility before the defense impeached her veracity. Assuming the evidence was improper, we conclude it had no effect on the trial's outcome.

During the rebuttal closing argument, the prosecutor defended the police investigation and praised Rice, Tina Jackson, and Joseph Salley for testifying despite facing risks and receiving no benefits. Evans complains that this constituted improper vouching for the credibility of these witnesses. We disagree. The prosecution may not vouch for the credibility of a witness either by placing the prestige of the government behind the witness or by indicating that information not presented to the jury supports the witness's testimony.[38] Here, defense counsel in closing argument extensively challenged the quality of the police investigation in this case and the credibility of the State's witnesses. The prosecutor's remarks were a reasonable response to this challenge. He did not suggest that there was unpresented evidence to support the witnesses' testimony, nor did he place the prestige of his office behind the witnesses.

*Failing to challenge prosecutorial misconduct during closing argument in the guilt phase*

Evans alleges that four instances of prosecutorial misconduct occurred during closing argument in the guilt phase and that his counsel were ineffective in failing to challenge them.

First, in responding to defense counsel's argument that Anthony Collins or other persons might have committed the murders, the prosecutor asked, ''where's the evidence?'' Evans claims this

[37]*Cf. Barrett v. State*, 105 Nev. 356, 359, 776 P.2d 538, 539-40 (1989) (where defendant attacked character of State's witness, State was entitled to present opinion testimony that witness was truthful).

[38]*Lisle v. State*, 113 Nev. 540, 553, 937 P.2d 473, 481 (1997), *clarified on other grounds by* 114 Nev. 221, 954 P.2d 744 (1998).

improperly shifted the burden of proof to the defense. Generally, prosecutorial comment on the failure of the defense to present witnesses or evidence impermissibly shifts the burden of proof.[39] However, this court held that a prosecutor was justified in commenting on a defendant's failure to call a person to testify where the defendant had "injected [the person] into the testimony as an alibi witness."[40] The Ninth Circuit has held that as long as a prosecutor's remarks do not call attention to a defendant's failure to testify, it is permissible to comment on the failure of the defense to counter or explain evidence presented.[41] Here, Evans injected the theory that someone else had committed the murders, and the prosecutor's remarks did not call attention to Evans's failure to testify. Therefore, the prosecutor could properly argue that the defense failed to substantiate its theory with supporting evidence.

Second, in discussing the definition of reasonable doubt as a doubt which would govern a person "in the more weighty affairs of life,"[42] the prosecutor said such affairs included choosing a spouse, a college, or an occupation. Defense counsel had argued that weighty affairs of life could include deciding whether to end life support for a badly injured child or parent, and the district court concluded that the prosecutor's assertion was a permissible response.

Defense counsel's remarks were improper, but did not justify the prosecutor's mischaracterization of reasonable doubt. This court has repeatedly cautioned the district courts and attorneys not to attempt to quantify, supplement, or clarify the statutorily prescribed standard for reasonable doubt.[43] In *Holmes v. State*[44] and *Quillen v. State*,[45] this court specifically held that it is improper to compare reasonable doubt to decisions such as choosing a spouse, buying a house, or changing jobs. The prosecutor's remedy was to object to defense counsel's remarks as impermissible elaboration on the definition of reasonable doubt, not to commit the same error in response. The error was harmless, however, because the jury received the proper written instruction on rea-

[39]*Whitney v. State*, 112 Nev. 499, 502, 915 P.2d 881, 883 (1996).

[40]*Colley v. State*, 98 Nev. 14, 16, 639 P.2d 530, 532 (1982).

[41]*U.S. v. Lopez-Alvarez*, 970 F.2d 583, 596 (9th Cir. 1992).

[42]*See* NRS 175.211(1).

[43]*See, e.g., Holmes v. State*, 114 Nev. 1357, 1366, 972 P.2d 337, 342-43 (1998).

[44]*Id.*

[45]112 Nev. 1369, 1382-83, 929 P.2d 893, 902 (1996).

sonable doubt.[46] We again caution the defense bar and prosecutors alike not to explain, elaborate on, or offer analogies or examples based on the statutory definition of reasonable doubt. Counsel may argue that evidence and theories in the case before the jury either amount to or fall short of that definition—nothing more.

Third, in responding to defense counsel's argument that police failed to properly investigate the role of Everett Flowers in the crimes, the prosecutor conceded Flowers's possible involvement, referred to the large homicide file, and stated that the investigation was ongoing. Evans now complains that these remarks argued facts not in evidence. This complaint is frivolous: the facts supported Evans's own strategy of accusing Flowers of the murder and certainly did not prejudice Evans.

Fourth, Evans complains that the prosecution made improper remarks, including that he was an "evil magnet." We conclude that the remarks were not improperly inflammatory and did not disparage legitimate defense tactics.[47]

### Failing to challenge prosecutorial misconduct during closing argument in the penalty phase

Evans contends that his counsel failed to respond effectively to prosecutorial misconduct during closing argument in the penalty phase. We agree that some of the prosecutor's remarks were erroneous and prejudicial.

[Headnotes 42–44]

First, the prosecutor made a number of comments that Evans says expressed personal opinion and lacked factual support. The prosecutor offered his view that the penalty hearing was not a rehabilitation hearing and asserted that its purposes were retribution and deterrence of Evans and others. He argued that when a person kills four people in a systematic way as in this case, "in my view, based upon this evidence, such a person has forfeited the right to continue to live." He also asked when the death penalty could be appropriate if not this case. We perceive no error in these remarks. A prosecutor in a penalty phase hearing may discuss general theories of penology, such as the merits of punishment, deterrence, and the death penalty.[48] And statements indicative of opinion, belief, or knowledge are unobjectionable

---

[46]See id. at 1383, 929 P.2d at 902.

[47]See Jones v. State, 113 Nev. 454, 469, 937 P.2d 55, 65 (1997); Williams v. State, 103 Nev. 106, 109-10, 734 P.2d 700, 702-03 (1987).

[48]Jimenez v. State, 106 Nev. 769, 772, 801 P.2d 1366, 1368 (1990).

when made as a conclusion from the evidence introduced at trial.[49]

The prosecutor also deplored "an era of mindless, indiscriminate violence" perpetrated by persons who "believe they're a law unto themselves." He argued that Evans "is one of these persons. This is his judgment day." Federal courts have held that it is improper for a prosecutor to urge the jury to convict in order to solve a social problem.[50] This court has similarly condemned comments in the penalty phase of a murder prosecution that diverted jurors' attention from their correct task, "which is the determination of the proper sentence for the defendant before them, based upon his own past conduct."[51] The remarks here inappropriately invoked circumstances beyond the case at hand, but we believe that they were not extreme and did not, standing alone, divert the jury from its proper task of sentencing Evans for his own crimes.

Other prosecutorial remarks were excessive and unacceptable and should have been challenged at trial and on direct appeal. In rebuttal closing, the prosecutor asked, "do you as a jury have the resolve, the determination, the courage, the intestinal fortitude, the sense of commitment to do your legal duty?" Asking the jury if it had the "intestinal fortitude" to do its "legal duty" was highly improper.[52] The United States Supreme Court held that a prosecutor erred in trying "to exhort the jury to 'do its job'; that kind of pressure . . . has no place in the administration of criminal justice."[53] "There should be no suggestion that a jury has a duty to decide one way or the other; such an appeal is designed to stir passion and can only distract a jury from its actual duty: impartiality."[54] The prosecutor's words here—"resolve," "determination," "courage," "intestinal fortitude," "commitment,"

---

[49]*Parker v. State*, 109 Nev. 383, 392, 849 P.2d 1062, 1068 (1993).

[50]*See, e.g., U.S. v. Leon-Reyes*, 177 F.3d 816, 822-23 (9th Cir. 1999); *U.S. v. Tulk*, 171 F.3d 596, 599-600 (8th Cir. 1999).

[51]*Collier v. State*, 101 Nev. 473, 478, 705 P.2d 1126, 1129 (1985), *modified on other grounds by Howard v. State*, 106 Nev. 713, 719, 800 P.2d 175, 178 (1990).

[52]Although this court noted a similar argument in *Castillo v. State*, 114 Nev. 271, 279-80, 956 P.2d 103, 109, *corrected by McKenna v. State*, 114 Nev. 1044, 1058 n.4, 968 P.2d 739, 748 n.4 (1998), it addressed only the prosecutor's argument on future dangerousness, not the reference to the jury's "duty."

[53]*United States v. Young*, 470 U.S. 1, 18 (1985).

[54]*United States v. Mandelbaum*, 803 F.2d 42, 44 (1st Cir. 1986).

"duty"—were particularly designed to stir the jury's passion and appeal to partiality.

The question is whether the prosecutor's improper remarks prejudiced Evans by depriving him of a fair penalty hearing.[55] Again, considered alone, perhaps they did not, but the prosecutor erred further. Commenting on penalty phase evidence that Evans was involved in cocaine trafficking and convicted of leaving the scene of a car accident, the prosecutor told the jury:

> Ms. Erickson argues that you can't consider or discuss that evidence unless you find that aggravating circumstances had been proven beyond a reasonable doubt. And it may be a semantical thing again, but regardless of the punishment you select, it doesn't seem inappropriate to have all the information you can get about the character of a defendant. *I just take issue with the remark that you have to wait until a certain point in the deliberation to consider* that someone has two prior felony convictions, and that he made his living by selling poison. It seems to me regardless of the punishment that ought to be a factor, as reasonable men and women, that you can consider.

(Emphasis added.) This argument was absolutely incorrect.

To determine that a death sentence is warranted, a jury considers three types of evidence: "evidence relating to aggravating circumstances, mitigating circumstances, and 'any other matter' which the court deems relevant to sentence.' "[56] The evidence at issue here was the third type, "other matter" evidence. In deciding whether to return a death sentence, the jury can consider such evidence only after finding the defendant death-eligible, *i.e.*, after it has found unanimously at least one enumerated aggravator and each juror has found that any mitigators do not outweigh the aggravators.[57] Of course, if the jury decides that death is not appropriate, it can still consider "other matter" evidence in deciding on another sentence.[58]

The State contends that the prosecutor was simply amending a statement by defense counsel, who told the jurors that they could not consider the "other matter" evidence introduced by the pros-

---

[55]*See Jones*, 113 Nev. at 469, 937 P.2d at 65.

[56]*Hollaway v. State*, 116 Nev. 732, 745, 6 P.3d 987, 996 (2000) (quoting NRS 175.552(3)).

[57]*Id.* at 746, 6 P.3d at 997.

[58]*Middleton v. State*, 114 Nev. 1089, 1117 n.9, 968 P.2d 296, 315 n.9 (1998).

ecution unless they first found an aggravating circumstance. The State maintains that the prosecutor's argument was therefore proper. We disagree. Defense counsel's argument was incomplete in that she did not tell the jurors that they could also consider the other evidence if they decided that death was not an appropriate sentence.[59] However, even if we assume that the prosecutor's improper argument was an attempt to cure the omission, it failed to do so. Instead, it incorrectly informed the jurors that they did not "have to wait until a certain point in the deliberation" to consider the other evidence. This was incorrect and in no way remedied defense counsel's incomplete argument.

Nor does it appear that defense counsel was trying to mislead the jury or somehow gain an unfair advantage when she failed to address the use of "other matter" evidence in the event that the jury rejected death and considered a lesser sentence. She was understandably concerned with the possibility of a death sentence and wished to prevent the other evidence from improperly influencing the jury's finding of statutory aggravating circumstances. Her argument was correct in that regard, as was her concern—the jury returned a death sentence and never reached the stage of considering sentences less than death. Of course, if the prosecutor was concerned that the jury might reach that stage, he had a right to inform the jury of the omission in the defense argument; instead, however, he made an incorrect argument that introduced affirmative error.

The State also asserts that the jury received proper written instructions. The instructions were accurate as far as they went but did not explain the restricted use of "other matter" evidence. Thus, they did not cure the error introduced by the incorrect argument.[60]

For future capital cases, we provide the following instruction to guide the jury's consideration of evidence at the penalty hearing:

> In deciding on an appropriate sentence for the defendant, you will consider three types of evidence: evidence relevant

---

[59]Defense counsel also incorrectly told the jurors that they could consider the other evidence once they found an aggravating circumstance. Actually, jurors are not to consider such other evidence until after each has weighed any mitigating circumstances against the aggravating circumstances. This misstatement, of course, did not prejudice the State.

[60]Cf. Emmons v. State, 107 Nev. 53, 60, 807 P.2d 718, 722 (1991) (holding that prosecutor's deliberate solicitation of improper remark was not cured by unspecific instruction cautioning jury to disregard evidence to which objection had been sustained), overruled on other grounds by Harte v. State, 116 Nev. 1054, 13 P.3d 420 (2000).

to the existence of aggravating circumstances, evidence relevant to the existence of mitigating circumstances, and other evidence presented against the defendant. You must consider each type of evidence for its appropriate purposes.

In determining unanimously whether any aggravating circumstance has been proven beyond a reasonable doubt, you are to consider only evidence relevant to that aggravating circumstance. You are not to consider other evidence against the defendant.

In determining individually whether any mitigating circumstance exists, you are to consider only evidence relevant to that mitigating circumstance. You are not to consider other evidence presented against the defendant.

In determining individually whether any mitigating circumstances outweigh any aggravating circumstances, you are to consider only evidence relevant to any mitigating and aggravating circumstances. You are not to consider other evidence presented against the defendant.

If you find unanimously and beyond a reasonable doubt that at least one aggravating circumstance exists and each of you determines that any mitigating circumstances do not outweigh the aggravating, the defendant is eligible for a death sentence. At this point, you are to consider all three types of evidence, and you still have the discretion to impose a sentence less than death. You must decide on a sentence unanimously.

If you do not decide unanimously that at least one aggravating circumstance has been proven beyond a reasonable doubt or if at least one of you determines that the mitigating circumstances outweigh the aggravating, the defendant is not eligible for a death sentence. Upon determining that the defendant is not eligible for death, you are to consider all three types of evidence in determining a sentence other than death, and you must decide on such a sentence unanimously.

In this case, we conclude that Evans's trial and appellate counsel were deficient in not challenging the prosecutor's improper argument, and we conclude that Evans was prejudiced as a result. This court has recognized the heightened need for reliability in capital cases and the ''tremendous risk that improperly admitted character evidence will influence a jury in setting a punishment for a convicted defendant. This risk is unacceptably high when the defendant has been convicted of murder and faces the death penalty.''[61] Although the evidence here was not improperly admit-

---

[61]*Flanagan v. State*, 112 Nev. 1409, 1419, 930 P.2d 691, 697 (1996).

ted, the prosecutor directed the jury to consider it improperly to determine death eligibility.

The Supreme Court has held that the Constitution requires a capital sentencing process to " 'genuinely narrow the class of persons eligible for the death penalty.' "[62] A sentencing scheme must direct and limit the sentencer's discretion to minimize the risk of arbitrary and capricious action.[63] It must provide a principled basis for the sentencer to distinguish defendants who deserve capital punishment from those who do not.[64] In Nevada, the finding of enumerated aggravators is essential to this narrowing function, and so is the weighing of such aggravators against any mitigating evidence. If the jurors relied prematurely on "other matter" evidence to find or give weight to enumerated aggravators, then the narrowing contemplated by the Nevada statutes and required by the Federal Constitution did not occur.[65] A new penalty hearing is therefore required.

*Failing to respond properly to the midtrial disclosure of an incriminating letter written by appellant*

During the trial the prosecutor provided the defense with a copy of a letter to Shirannah Rice written by Evans. In the letter Evans asked Rice to change her testimony to help him in this case. Defense counsel learned of the letter after they had begun to cross-examine Rice. Rice had given the letter to the prosecutor that morning, the prosecutor did not read it until lunch hour, and then he provided it to the defense. Defense counsel moved for a complete continuance of the trial until the next morning or at least the continuance of Rice's cross-examination and any testimony by Alicia and Adriana Ventura until the next day. The district court granted the latter remedy, and other witnesses testified that afternoon.

Evans claims that the district court abused its discretion in not continuing the trial for the afternoon and that he was prejudiced because concern about the letter distracted his counsel's attention from effectively cross-examining the State's witnesses that afternoon and Alicia and Adriana Ventura the next day. He also claims that his trial counsel were ineffective in failing to convince the

[62]*See Arave v. Creech*, 507 U.S. 463, 474 (1993) (quoting *Zant v. Stephens*, 462 U.S. 862, 877 (1983)).

[63]*Id.* at 470.

[64]*Id.* at 474.

[65]*See Hollaway*, 116 Nev. at 746, 6 P.3d at 997; *Middleton*, 114 Nev. at 1116-17, 968 P.2d at 314-15.

court to exclude the evidence. Evans's claim that he was prejudiced remains conclusory; he does not specify how the cross-examination of any witnesses was inadequate. Moreover, the evidence was properly admitted.

NRS 174.295(1) provides that if a party discovers additional material during trial which is subject to discovery, it shall promptly notify the other party or the court of the existence of the material. NRS 174.295(2) provides that if a party fails to comply with discovery provisions, the court may order the discovery of the undisclosed material, prohibit its introduction into evidence, grant a continuance, or ''enter such other order as it deems just under the circumstances.'' The district court has broad discretion in fashioning a remedy under this statute; it does not abuse its discretion absent a showing that the State acted in bad faith or that the nondisclosure caused substantial prejudice to the defendant which was not alleviated by the court's order.[66]

Evans implies that the State may have acted in bad faith: he argues that there is no evidence that the prosecutor did not already know about the letter before it came into his possession. We discern no support for this speculation. Evans also asserts that the letter was a written statement by Evans that was not disclosed to him in violation of NRS 174.235.[67] Assuming that this statute applies here, we conclude that it was complied with.

The record indicates the prosecutor disclosed the letter to the defense as soon as he learned its significance; therefore, no discovery violation occurred. And, despite the unavoidably late disclosure of the letter, no substantial prejudice resulted. The district court provided an appropriate remedy by postponing the cross-examination of the letter's recipient and the testimony of two other key witnesses.

### Failing to adequately impeach the testimony of two witnesses

Evans claims that his trial counsel failed to investigate Joseph Salley and Alicia Ventura and thus to fully impeach their testimony.

We perceive no prejudicial deficiency in trial counsel's cross-examination of Ventura. In fact, the record shows that Ventura tes-

---

[66]*Langford v. State*, 95 Nev. 631, 635, 600 P.2d 231, 234-35 (1979).

[67]NRS 174.235(1) provides in part:

[A]t the request of a defendant, the prosecuting attorney shall permit the defendant to inspect and to copy or photograph any:

(a) Written or recorded statements or confessions made by the defendant, . . . within the possession, custody or control of the state, the existence of which is known, or by the exercise of due diligence may become known, to the prosecuting attorney[.]

tified to most of the facts which Evans claims his counsel failed to elicit.

Evans complains that his counsel failed to impeach Salley with two felony convictions—grand theft in California and attempted possession of a stolen vehicle in Nevada—and the fact that he lied to police about his identity on numerous occasions. Evans also claims that Salley's criminal history could have been used to establish that he expected to receive benefits from the police in return for his cooperation in this case and to contradict the time period he gave for speaking to Evans. The "time period" claim remains conclusory and unsupported by specific factual allegations, but we conclude that trial counsel were deficient in not impeaching Salley with his criminal history, although counsel did confront Salley forcefully with inconsistencies between his testimony and a prior statement.

The question is whether there was a reasonable probability of a different result if such impeachment had occurred. Salley's testimony—that Evans made two incriminating admissions regarding the murders—was significant, and jurors might have discounted it if they knew he was a felon or suspected he had benefited from testifying. On the other hand, Shirannah Rice and Tina Jackson also testified that Evans made incriminating admissions about the murders. Therefore, we conclude that even if jurors had given Salley's testimony little or no weight, a different result was not reasonably probable.

*Not introducing evidence at the penalty phase of a federal sentence received by a suspect in the murders*

Evans contends that his trial counsel were ineffective for not introducing evidence at the penalty phase that a federal court found that the prosecution failed to prove that Richard Powell was involved in the murders. The doctrine of the law of the case precludes reconsidering this issue.[68] On direct appeal this court concluded that the evidence was not admissible: "The final decision reached by the federal court with respect to Powell in no way relates to Evans' relative culpability."[69]

Evans says that this conclusion was wrong because in *Flanagan v. State* this court stated that "it was proper and helpful for the

---

[68]*See Pertgen*, 110 Nev. at 557-58, 875 P.2d at 363.

[69]*Evans*, 112 Nev. at 1199, 926 P.2d 282-83.

jury to consider the punishments imposed on the co-defendants.''[70] *Flanagan* is distinguishable, however, because it involved co-defendants all convicted in state court of murder or manslaughter in regard to the same homicides.[71] Powell's conviction was in federal court for drug trafficking, not for the murders of which Evans was convicted.[72]

### *Failing to challenge the information for being vague*

Evans complains that the criminal information alleged that he aided and abetted in committing the four murders without specifying how. The information charged that Evans did

> wilfully, feloniously, without authority of law and with malice aforethought and premeditation and/or while in the commission of a burglary, kill [each victim], by shooting into her [or his] body with a deadly weapon, to-wit: a firearm, said Defendant acting in concert with and aiding or abetting another person or other persons in the commission of said crime.

An information ''must be a plain, concise and definite written statement of the essential facts constituting the offense charged.''[73] It must either specify the means by which a charged offense was accomplished or allege that the means are unknown.[74] Citing constitutional due process, this court has held that

> where the prosecution seeks to establish a defendant's guilt on a theory of aiding and abetting, the indictment should specifically allege the defendant aided and abetted, and should provide additional information as to the specific acts constituting the means of the aiding and abetting so as to afford the defendant adequate notice to prepare his defense.[75]

The information did not allege any specific acts in regard to aiding and abetting. Thus Evans is correct that the information failed to give him adequate notice of the State's theory of aiding

---

[70]107 Nev. 243, 248, 810 P.2d 759, 762 (1991), *vacated on other grounds*, 503 U.S. 930, 931 (1992).

[71]*See id.* at 251 (Rose, J., concurring).

[72]*See Evans*, 112 Nev. at 1198 n.25, 926 P.2d 282 n.25. In fact, Powell was recently convicted in the Eighth Judicial District Court of four counts of first-degree murder for the murders in this case. He did not receive a death sentence. He has appealed to this court in Docket No. 37374.

[73]NRS 173.075(1).

[74]NRS 173.075(2).

[75]*Barren v. State*, 99 Nev. 661, 668, 669 P.2d 725, 729 (1983).

and abetting. However, he must also show that he was prejudiced as a result: "Where a defendant has not been prejudiced by the charging instrument's inadequacy the conviction will not be reversed."[76]

Evans claims that the State varied its theory of the case "according to the whims of its witnesses," but he fails to substantiate this claim with citations to the record. It appears that the State's basic theory of the case did not vary: it alleged that Evans let another man into the victims' apartment, and the two, acting together, shot the four victims to death. We conclude that Evans has demonstrated no prejudice due to the vagueness of the information.

### Not arguing that this court fails to conduct fair and adequate appellate review

Evans asserts that this court fails "to conduct fair and adequate appellate review in capital cases generally and in this case specifically." He contends that the court's caseload is so heavy that the justices cannot meaningfully review cases and must rely on staff. Evans further asserts:

> This Court has treated death penalty cases differently from other criminal cases. In enacting [SCR] 250, the Court has created a climate in which death penalty cases are singled out for a more expedited review process, in which capital cases receive fewer attorney resources, fewer appellate court staff resources and less time for preparation than other cases on the court's docket.

He also asserts that this court's review is "limited to reviewing bench memoranda prepared by recent law school graduates." Evans claims that his appellate counsel was ineffective in not making these allegations.

The district court concluded that it lacked jurisdiction to review these allegations. Evans maintains that he simply raised a factual claim which the district court may rule on. We conclude that the district court correctly declined to review or adjudicate these claims. In effect, Evans asked the district court to exercise supervisory and appellate review over the functioning and decisions of this court, in contravention of the order of our judicial system. This court "possesses inherent power to prescribe rules necessary or desirable to handle the judicial functioning of the courts" and is charged with the governance of the district courts, not vice

---

[76]*Koza v. State*, 104 Nev. 262, 264, 756 P.2d 1184, 1186 (1988).

versa.[77] As for the substance of Evans's allegations, we conclude that they lack any merit.

This court does, of course, treat cases involving the death penalty differently from other cases—as required by federal constitutional law. However, this different treatment does not entail less time or fewer resources for review of capital cases. On the contrary, SCR 250 and the internal policies of this court ensure that such cases receive extra resources and heightened scrutiny. For example, SCR 250(6)(c) requires that the entire district court record be sent to this court in every direct capital appeal, while in other appeals we require the parties to omit unessential materials from the record and compile and submit an appendix.[78] We try to ensure that capital defendants and appellants receive competent representation by requiring appointed counsel in capital cases to be qualified pursuant to criteria set forth in SCR 250(2). The briefing schedule in capital cases is not rushed as well. SCR 250(6)(e) and (7)(d) provide for a 60-day extension of time to file a brief in any capital appeal upon a showing of good cause, and capital appellants routinely seek and receive such extensions. In fact, in this case Evans sought and received an extension of 60 days to file his opening brief; he later filed an untimely motion for an extension of time to file his reply brief, which we also granted. In addition, this court permitted Evans to file an opening brief of 120 pages and a reply brief of 54 pages, far in excess of the normal 30-page limit for briefs prescribed by NRAP 28(g). All of this contradicts Evans's allegations.

Further, a recent law school graduate working as a law clerk in chambers could indeed have prepared the initial memo dealing with Evans's direct appeal in 1996, but our review of any case before us has never been limited to reading memos by our staff. A law clerk responsible for analyzing any case receives guidance and scrutiny from the law clerk's justice as well as from other justices and experienced attorneys on this court's central staff. Moreover, for the past few years this court has assigned all capital cases for analysis and recommendation to a team of central staff attorneys with experience and expertise in death penalty jurisprudence. In any case before us, each justice of this court freely consults any and all parts of the parties' briefs and the record, and we discuss cases directly with the staff attorney or law clerk to whom a case is assigned. We also hear oral argument in nearly all, if not all, direct appeals of capital convictions.

---

[77]*State v. Dist. Ct.*, 116 Nev. 953, 963, 11 P.3d 1209, 1215 (2000); NRS 2.120; *see also* Nev. Const. art. 6, § 6 (limiting the appellate jurisdiction of the district courts to "cases arising in Justices Courts and such other inferior tribunals").

[78]*See* NRAP 10(b); NRAP 30.

All these facts and considerations belie the charge that this court inadequately reviews capital cases or devotes less time and fewer resources to them than to other criminal cases, and in fact the opposite is true.

*The instruction on deliberation and premeditation (and the limited holding in* Lozada v. State)

Evans's counsel argued at trial and on direct appeal that the jury instruction on deliberation and premeditation was erroneous.[79] Nevertheless, Evans asserts that his counsel did not fully and competently address the issue. He also asserts that this court erred in deciding the issue on direct appeal and that this error constitutes good cause under *Lozada v. State*[80] to raise the issue again in a habeas petition.

The jury in this case received the Kazalyn instruction on premeditation and deliberation, which this court recently abandoned in *Byford v. State*.[81] Evans does not explain how his counsel were deficient in challenging the jury instruction. Thus this claim lacks specific allegations that if true would warrant relief.

Evans simply argues that under *Byford* the use of the *Kazalyn* instruction was error and that this court is wrong to refuse to apply *Byford* retroactively. We have held that "with convictions predating *Byford*, neither the use of the *Kazalyn* instruction nor the failure to give instructions equivalent to those set forth in *Byford* provides grounds for relief."[82] *Byford* was decided after Evans was convicted and therefore provides him no relief. Relying on *Byford*, Evans also faults his counsel for failing to challenge the constitutionality of Nevada's death penalty scheme as providing at the time of his trial no meaningful distinction between first- and second-degree murder. This is simply the same issue in different clothing, and we reject it.

Incidentally, we note that the proof here that the murders were deliberate and premeditated was ample: the evidence shows that Evans and Powell planned to murder Scotti and that after Evans arrived at the apartment he considered his actions and determined to kill the other adult occupants as well.

Evans also tries to extend our decision in *Lozada* inappropri-

---

[79]*See Evans*, 112 Nev. at 1191-92 & n.22, 926 P.2d at 278 & n.22.

[80]110 Nev. 349, 871 P.2d 944 (1994).

[81]116 Nev. 215, 233-37, 994 P.2d 700, 712-14, *cert. denied*, 531 U.S. 1016 (2000).

[82]*Garner v. State*, 116 Nev. 770, 789, 6 P.3d 1013, 1025 (2000), *cert. denied*, 532 U.S. 929 (2001).

ately as authority to circumvent the doctrine of the law of the case. In his briefs, he repeatedly argues that this court erred on direct appeal and therefore good cause exists under *Lozada* to overcome habeas procedural bars. In *Lozada*, this court held that its own error in rejecting a claim of ineffective assistance of counsel in an earlier habeas petition "constitutes an external force which excuses the filing of a successive petition."[83] However, this court recognized its error not because it abandoned the doctrine of the law of the case and reconsidered its decision at Lozada's urging. Rather, it did so because the federal courts, in considering Lozada's federal habeas petition, ruled in his favor and contrary to this court's earlier decision.[84] Thus, *Lozada* is limited by its facts and does not provide a general license to question this court's holdings: unless a federal court concludes that a determination by this court is erroneous, *Lozada* is inapplicable, and the parties and district court should respect the law of the case as pronounced by this court.

### Other claims of ineffective assistance of counsel

After considering the following claims of ineffective assistance of counsel, we conclude that they warrant no relief.

Evans claims that his trial counsel were deficient in failing to file numerous pretrial motions. He provides no supporting argument, so the claims warrant no discussion.[85] He also improperly relies in part on reference to his habeas petition.[86]

Evans asserts that his trial counsel did not conduct adequate pretrial investigation and were thus unprepared to cross-examine some witnesses or call others. His claims remain vague, failing to include specific factual allegations that, if true, establish prejudice.

Evans asserts that his counsel were ineffective under *Morgan v. Illinois*[87] in not asking potential jurors whether they would always impose the death penalty on a defendant convicted of first-degree murder. Here, unlike in *Morgan*, potential jurors filled out a questionnaire asking that question, and the district court excused any who answered that they would. Therefore, we conclude that Evans has not shown that he was prejudiced.

---

[83]110 Nev. at 357-58, 871 P.2d at 949.

[84]*Id.* at 351-52, 871 P.2d at 945.

[85]*See Byford*, 116 Nev. at 225, 994 P.2d at 707 (this court need not address issues unsupported by cogent argument).

[86]*See* NRAP 28(e) (a brief to this court cannot incorporate by reference briefs or memoranda filed in district court).

[87]504 U.S. 719 (1992).

Evans complains that his counsel did not challenge a number of bench and in-chambers conferences which were not recorded and took place without his presence. He maintains that at these conferences the district court took substantive actions that violated his constitutional rights. He goes so far as to claim that the district court "refused to allow portions of the trial to be recorded." He fails to substantiate this irresponsible claim in any way. We remind the district courts and attorneys that capital proceedings should be fully reported and transcribed.[88] But we conclude that Evans presents absolutely no basis for this court to fear that a substantial or significant portion of the record was omitted or that he has been prejudiced in any way. Evans argues that it is impossible for him to show that the "secret proceedings" were prejudicial precisely because they were unrecorded. However, he has done nothing to support his vague accusations of wrongdoing and prejudice with any discussion of the record or a single affidavit.

Evans asserts that his trial counsel were ineffective because they elicited testimony that he was an ex-felon. It appears that counsel delved into this information based on tactical decisions. Assuming the decisions were not reasonable, we conclude that the information was not prejudicial.[89]

Evans claims that his counsel failed to challenge the prosecutor's endorsement of witnesses and to prepare adequately for the examination of witnesses. The gist of this claim seems to be that the prosecutor's endorsement of witnesses was excessive and untimely. Evans does not specify how his counsel could have better cross-examined the State's witnesses and thus fails to show prejudice.

Evans contends that his counsel should have called expert witnesses: an expert on urban social and cultural demography; an expert on law enforcement practices; and an expert on the competency of Adriana Ventura to testify. Evans fails to allege specifically what these experts could have done to make a different result reasonably probable.

Evans alleges that his counsel were ineffective because they failed to challenge the validity of a wiretap and the admissibility of wiretap evidence. Assuming that this is not simply a more detailed and precisely focused argument of an issue already

---

[88]*See* SCR 250(5)(a).

[89]*Cf. Brown v. State*, 114 Nev. 1118, 1126, 967 P.2d 1126, 1131 (1998) (concluding that joinder of charges that revealed that the defendant was an ex-felon did not have a substantial or injurious effect).

decided by this court in dismissing Evans's appeal from the denial of his motion for a new trial, his argument still warrants no relief. Wiretap evidence was not admitted at trial, and Evans does not show that the prosecution's knowledge of the evidence prejudiced him.

Evans contends that his trial counsel did not properly investigate and prepare for the penalty phase. He does not identify any fact they should have discovered or any specific deficiency in the way they handled the penalty phase.

Evans complains that his trial counsel failed to prepare Evans's mother and two sisters for the penalty phase so that they could provide more mitigating evidence. Evans fails to allege with any specificity what that evidence would have been.

Evans claims that his appellate counsel was ineffective in not challenging the district court's refusal to allow individual voir dire of potential jurors. We conclude that this claim has no merit. As authority Evans cites *Hovey v. Superior Court*,[90] but he fails to note that this California Supreme Court decision has been abrogated by statute.[91]

Evans contends that his counsel were ineffective in not arguing on several grounds that Nevada's death penalty scheme is unconstitutional. On direct appeal this court determined that the aggravators found against Evans were sound, and we reject his facial challenge to the scheme.

Evans claims that his was the first capital case for both of his trial counsel and therefore that neither was qualified under SCR 250 to act as first chair at the trial. This claim deserves no consideration: Evans does not cite the record to support it, nor does he indicate specifically how he was prejudiced.

Evans contends that his appellate counsel was ineffective because she failed to file a reply brief on direct appeal to respond to errors in facts and arguments presented in the State's answering brief. He does not identify any such errors and so fails to show any prejudice.

*Waiver of an issue*

A court must dismiss a habeas petition if it presents claims that either were or could have been presented in an earlier proceeding, unless the court finds both cause for failing to present the claims earlier or for raising them again and actual prejudice to the

---

[90]616 P.2d 1301 (Cal. 1980).

[91]*See Covarrubias v. Superior Court*, 71 Cal. Rptr. 2d 91, 92, 94 (Ct. App. 1998).

petitioner.[92] Claims of ineffective assistance of counsel are properly presented in a timely, first post-conviction petition for a writ of habeas corpus. Because such a claim is generally not appropriate for review on direct appeal, the failure to raise it "on direct appeal does not constitute a waiver of the claim for purposes of post-conviction proceedings."[93] However, post-conviction habeas claims that are independent of ineffective assistance claims and that could have been raised on direct appeal are waived.[94]

Although this is a post-conviction habeas proceeding, in his briefs to this court Evans focuses directly on perceived errors at his trial and asserts ineffective assistance of counsel in a *pro forma*, perfunctory way. Although these assertions are sometimes barely adequate to state a claim of ineffective assistance, we have dealt with the above claims as such. His opening brief also contains a section that asserts that trial counsel were ineffective "for the reasons set forth" in the issues raised in the rest of the brief. This court will not accept such conclusory, catchall attempts to assert ineffective assistance of counsel. If first-time applicants for post-conviction habeas relief fail to argue specifically that their trial or appellate counsel were ineffective in regard to an issue or to show good cause for failing to raise the issue before, that issue will not be considered, pursuant to NRS 34.810.

Evans claims that jury instruction number 24, on the possible guilt of other persons, erroneously endorsed a conviction based on guilt by association. However, he alleges neither ineffective assistance in this regard nor cause for failing to raise this claim at trial or on direct appeal; therefore, it is procedurally barred. We conclude that it is also patently meritless.

*Cumulative error*

The cumulative effect of multiple errors may violate a defendant's constitutional right to a fair trial even though errors are harmless individually.[95] Evans argues that such an effect exists here.

Several of Evans's claims have some merit: the admission of the hearsay statement which did not fall within the co-conspirator

---

[92]NRS 34.810.

[93]*Daniels*, 100 Nev. at 580, 688 P.2d at 316.

[94]*See Kirksey*, 112 Nev. at 998 n.10, 923 P.2d at 1114 n.10.

[95]*Byford*, 116 Nev. at 241-42, 994 P.2d at 717.

exception; evidence of some witnesses' fear; evidence of prior consistent statements; mischaracterization of the reasonable doubt standard; failure to impeach Joseph Salley with his criminal history; inadequate notice of aiding and abetting.

The question is: if counsel had effectively responded to these errors, was there a reasonable probability that Evans would not have been convicted of first-degree murder? We conclude that there is no such reasonable probability. Three witnesses—Shirannah Rice, Tina Jackson, and Salley—testified that Evans made incriminating admissions about the murders. Adriana saw the murderers and knew one of them as "Little Ray" or "Uncle Ray," and Ventura explained that Adriana referred to Evans this way. Finally, Evans's own letter to Rice, asking her to change her testimony, provided objective evidence consistent with Evans's guilt. Therefore, we conclude that the incriminating evidence was strong enough that the errors do not undermine confidence in the trial's result.

## CONCLUSION

We affirm the district court's order denying habeas relief insofar as it upholds Evans's conviction. The failure of Evans's trial and appellate counsel to object to the prosecutor's misstatement to jurors of how to employ evidence in the penalty phase constituted ineffective assistance of counsel. We therefore reverse the district court's order in part and vacate Evans's death sentence. We remand this case for a new penalty hearing consistent with this opinion.

YOUNG, SHEARING, AGOSTI and ROSE, JJ., concur.

MAUPIN, C. J., with whom LEAVITT, J., agrees, concurring in part and dissenting in part:

I would affirm the denial of Evans's petition for post-conviction relief in its entirety.

### Claims of prosecutorial misconduct

A jury may consider three categories of evidence in determining whether the death penalty is warranted: "evidence relating to aggravating circumstances, mitigating circumstances, and 'any other matter which the court deems relevant to sentence.'"[1] The jury may not consider the third or "other" category of evidence in support of the imposition of the death penalty until it has determined "death eligibility," i.e., after it has, at a minimum, unanimously found the existence of at least one statutorily enumerated

---

[1]*Hollaway v. State,* 116 Nev. 732, 745, 6 P.3d 987, 996 (2000) (quoting NRS 175.552(3)).

"aggravator." As the majority notes, the "other evidence" may always be considered in a determination of the three non-death penalty sentencing options. The other available penalties include life imprisonment without the possibility of parole, life imprisonment with the possibility of parole, and a fixed term of fifty years imprisonment with parole eligibility after twenty years.

The defense attempted to address the "other evidence" against Evans, including evidence that he had been involved in cocaine trafficking and had been convicted of leaving the scene of a car accident:

> It [the "other" evidence] is evidence of other bad conduct on Vernell's part, and it cannot be considered by you at all, discussed, or even thought about at all until you decide whether the State has proven beyond a reasonable doubt that an aggravating circumstance exists as to each of the persons—as to each of the victims. You can't even talk about the fact that he pled guilty to this. But if you find that there's an aggravating circumstance, then and only then can this conduct be any influence on your sentencing determination.

In apparent response, the prosecutor made the following statement during his penalty phase closing argument:

> [Defense counsel] argues that you can't consider or discuss that evidence unless you find that aggravating circumstances had been proven beyond a reasonable doubt. And it may be a semantical thing again, but *regardless of the punishment you select*, it doesn't seem inappropriate to have all the information you can get about the character of a defendant. I just take issue with the remark that you have to wait until a certain point in the deliberation to consider that someone has two prior felony convictions, and that he made his living by selling poison. It seems to me regardless of the punishment that ought to be a factor, as reasonable men and women, that you can consider.

(Emphasis added.) The majority concludes that this argument erroneously distorts the nature of a death penalty jury's obligations regarding the consideration of "other evidence." According to the State, its argument was not made with regard to the jury's obligation to resolve the existence of statutory aggravating circumstances, *i.e.*, death eligibility, before moving on to other evidence supporting the death penalty. Rather, the State contends the argument was designed to correct an implication in the above-quoted argument by the defense that the jury could never consider such evidence, even on the question of the other available sentences, unless the jury unanimously found the existence of an aggravating circumstance.

It is evident that the defense argument was intended to re-assert the principle that the jury could not consider this other information in support of the death penalty until death eligibility had been determined. However, the defense argument did improperly imply that matters beyond the statutory aggravators could not be relied upon by the jury in determining the other potential sentencing alternatives in the absence of an aggravating circumstance. Thus, it was appropriate for the prosecution to correct the misstatement. This notwithstanding, the argument of which Evans complains does, by its terms, seemingly relate to the obligation of the jury to first determine ''death eligibility'' before considering other matters with regard to that particular sentence.

It is evident that the above-quoted arguments made on behalf of both sides contained erroneous general statements about mutually exclusive concepts in the sentencing process. However, prior to the prosecutor's statement, the trial judge, the prosecutor himself and defense counsel correctly and repeatedly admonished the jury as to its role and the structure for its determination of penalty.

First, the prospective jurors were oriented during voir dire examination to the rules governing its deliberations over the death penalty. Second, the jury was correctly instructed on the issue:

> The jury may impose a sentence of death only if it finds at least one aggravating circumstance has been established beyond a reasonable doubt and further finds that there are no mitigating circumstances sufficient to outweigh the aggravating circumstance or circumstances found.
>
> . . . .
>
> You must first determine unanimously whether or not the state has proved beyond a reasonable doubt that an aggravating circumstance or circumstances exist in this case. . . .
>
> If you find that an aggravating circumstance or circumstances exist, you must then weigh any mitigating factor or factors, which any juror believes has been shown against the aggravating circumstance or circumstances. If you find that the mitigating circumstances outweigh the aggravating circumstances, you are not permitted to consider imposing the death penalty and you must then determine whether the defendant should be sentenced to life imprisonment . . . .
>
> If you find that the mitigating factors do not outweigh the aggravating circumstances, then and only then may you consider imposing the death penalty.

Third, defense counsel, during her penalty phase final argument, stressed and read the above-quoted language. Fourth, prior to the arguably improper argument, counsel for the State also quoted and stressed the same instruction.

The prosecutor's statement was made in passing, related to a

separate defense argument regarding other penalties, and did not unequivocally address the requirements for imposition of the death penalty. Thus, in my view, the statement did not change the outcome. It should be remembered that, in addition to a very carefully conducted trial, Evans confessed to the murder and his motivations, and a young but competent eyewitness described the literal ''execution'' of the victims. Thus, I would not remand this matter for a new penalty hearing.[2]

---

[2]I agree that the majority's suggested instruction on the use of ''other evidence'' should serve as a guide in future death penalty litigation.